# IN RE JEREMY M.*
## (AC 26548)

Flynn, C. J., and Schaller and Lavine, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued October 17, 2006—officially released April 10, 2007

*Annacarina Del Mastro*, senior assistant public defender, for the appellant (respondent).

*Bruce R. Lockwood*, assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Joseph J. Kristan, Jr.*, juvenile prosecutor, for the appellee (petitioner).

*Opinion*

FLYNN, C. J. The respondent, Jeremy M., appeals from the judgment of the trial court adjudicating him a delinquent for having committed the crime of breach of the peace in the second degree in violation of General

Statutes § 53a-181 (a) (1).[1] On appeal, the respondent claims that (1) there was insufficient evidence for the court to find that he had committed a breach of the peace, (2) the court improperly failed to inquire into his complaints concerning a breakdown in communication between him and his court-appointed counsel and (3) the court improperly appointed a guardian ad litem to represent him in the delinquency proceedings and failed to instruct the guardian ad litem about her duties.[2] We affirm the judgment of the trial court.

The court reasonably could have found the following relevant facts and procedural history. On the afternoon of April 8, 2004, the respondent, who then was thirteen years old, was playing in the front yard of his house at the edge of the street with two of his friends. The respondent had a pellet gun in his possession, which was a replica of a Double Eagle 2000, .45 caliber handgun. As the respondent was playing with the replica .45 caliber handgun, he pointed the gun at the victim, an eleven year old girl, who was playing with her younger brother in the driveway of their home, which was located across the street from the respondent's house. After observing the respondent point the gun at her, the victim became scared and upset and ran into her house, informing her mother of the respondent's actions. The victim's mother then looked outside and noticed the respondent and two boys playing with a gun. The victim's mother reported the incident to the

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place . . . ."

[2] In his main brief, the respondent also claims that the breach of the peace statute under which he was adjudicated is unconstitutionally vague as applied to the facts of his case, and, therefore, the statute is void for vagueness. The respondent, however, subsequently withdrew this claim in his reply brief.

police. Officer Timothy Bergean of the Enfield police department responded to the scene, and, after investigating the incident, he arrested the respondent.

In a delinquency petition, the petitioner, the commissioner of children and families, charged the respondent with two counts of brandishing a firearm in violation of General Statutes § 53-206c and two counts of breach of the peace in violation of General Statutes § 53-181.[3] After several continuances occurring within a three month period, the trial commenced on December 7, 2004, in the Superior Court for Juvenile Matters.

On the opening day of trial, the petitioner presented Bergean as a witness. Bergean testified that upon arriving at the scene, he interviewed the victim, as well as the victim's brother and mother. Then, Bergean went to the respondent's house to question him, in the presence of his father, concerning the incident. During his conversation with Bergean, the respondent admitted to playing with a pellet gun, which was an imitation .45 caliber handgun, and to pointing the gun across the street. The respondent, however, denied pointing the gun at anyone. According to Bergean, the distance from the respondent's house to the victim's house was approximately twenty yards. Bergean further testified that he inspected and subsequently seized the respondent's pellet gun, which was a replica of a Double Eagle 2000, .45 caliber handgun. The pellet gun, according to Bergean, resembled a "modern day handgun" and not an antique firearm. In his testimony, Bergean acknowledged that from a distance of approximately twenty yards, he would be unable to discern whether the respondent's gun was real or fake. Following Bergean's

[3] At the January 11, 2005 delinquency proceeding, the petitioner asserted that with respect to the breach of the peace count, the state was proceeding under subdivision (1) of subsection (a) of § 53a-181. See General Statutes § 53a-181 (a) (1).

testimony, the court continued the trial until January 11, 2005.

On January 11, 2005, the petitioner resumed the presentation of her case against the respondent by introducing the victim and the victim's mother as witnesses. The victim testified that on April 8, 2004, the respondent, who was standing across the narrow street from the victim, pointed a gun at her and her brother. After observing the respondent point the gun at them, the victim and her brother hid behind their mother's car, which was parked in the driveway, and then ran into their house because they were scared. The victim further testified that as a result of the respondent's conduct, she became very upset and cried.

The victim's mother testified that on April 8, 2004, her children suddenly ran into the house crying. After learning the cause of the children's distress, the victim's mother looked out the window and observed the respondent, along with two other youths, playing with a gun. The victim's mother also testified that she saw the respondent wave the gun around and point it at various things. Although the victim's mother stated that the gun appeared real, she acknowledged that she could not determine positively whether the respondent's gun was real from her vantage point at the window.

The respondent then presented one of the boys who had been playing with the respondent on the afternoon of the incident as a witness. During his testimony, the boy acknowledged that the victim and her brother were playing across the street. The boy, however, testified that the respondent did not point the pellet gun at the victim and her brother. The boy further stated that the pellet gun looked like a black handgun.

Thereafter, in its February 8, 2005 memorandum of decision, with respect to the fourth count, the court found the respondent guilty of breach of the peace in

the second degree and adjudicated him as a delinquent. The court, however, found the respondent not guilty of the remaining three counts.[4] The court also ordered the respondent to participate in a predispositional study and to return to court at a later date. At the dispositional hearing on April 5, 2005, the court discharged the respondent without further obligation to the court.[5] Additional facts and procedural history will be set forth where necessary. This appeal followed.

As a threshold matter, we must determine whether we are precluded from reviewing the respondent's claims because they are moot. The petitioner argues that the respondent's appeal from the judgment of the court adjudicating the respondent as a delinquent is moot because the respondent cannot receive any direct practical relief from this court. We disagree with the petitioner and conclude that this appeal is not moot.

Mootness implicates subject matter jurisdiction, and, therefore, we will not review claims that are moot. *In re Darien S.*, 82 Conn. App. 169, 173, 842 A.2d 1177, cert. denied, 269 Conn. 904, 852 A.2d 733 (2004). "[T]he test for determining mootness is not [w]hether the [respondent] would ultimately be granted relief . . . .

---

[4] In its memorandum of decision, the court noted that the delinquency petition charged the respondent, in part, with two counts of breach of the peace based on two alleged victims. The court found that the respondent had committed a breach of the peace only as to the victim who testified at trial and, therefore, was not guilty as to the other breach of the peace count. The court also found that the respondent was not guilty of two counts of brandishing a firearm under § 53-206c because the petitioner failed to prove the elements of that offense beyond a reasonable doubt.

[5] We note that the court's disposition of this matter, discharging the respondent without further obligation to the court, does not negate the conclusion that there was a final judgment. In *In re Juvenile Appeal (82-AB)*, 188 Conn. 557, 452 A.2d 113 (1982), a juvenile was adjudicated as a delinquent, and the court dismissed the juvenile with a warning. Our Supreme Court addressed the issue of whether there was a final judgment and held that "[d]ismissal from accountability to the court . . . is not inconsistent with the continued existence of a reviewable order, the adjudication of delinquency itself." Id., 559.

The test, instead, is whether there is any practical relief this court can grant the [respondent]. . . . If no practical relief can be afforded to the parties, the appeal must be dismissed." (Citation omitted; internal quotation marks omitted.) *State* v. *Fabricatore*, 89 Conn. App. 729, 743, 875 A.2d 48 (2005), aff'd, 281 Conn. 469, 915 A.2d 872 (2007). "It is a well-settled general rule that the existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." (Internal quotation marks omitted.) *In re Steven M.*, 264 Conn. 747, 754, 826 A.2d 156 (2003).

In the present case, the petitioner argues that because the court discharged the respondent from further obligation to the court and did not place him on probation or commit him to the department of children and families, this appeal is moot as direct practical relief is unavailable. The petitioner contends that if this court were to reverse the judgment of the trial court, which adjudicated the respondent as a delinquent, we would be unable to afford any practical relief to the respondent. We disagree with the petitioner.

We find illustrative the case of *In re Juvenile Appeal (82-AB)*, 188 Conn. 557, 559–60, 452 A.2d 113 (1982), in which our Supreme Court held that a respondent's appeal was not moot where the Juvenile Court had found the respondent to be delinquent and, thereafter, had dismissed the respondent with a warning. Our Supreme Court noted that Practice Book § 1062, which was predicated on General Statutes § 51-327, discussed the erasure of police and court records of delinquent juveniles.[6] Id. The automatic erasure of a juvenile's

---

[6] In *In re Juvenile Appeal (82-AB)*, supra, 188 Conn. 559, our Supreme Court cited Practice Book § 1062, which in turn referred to General Statutes § 51-327. Section 1062 was repealed in 1997, and § 51-327 was transferred to General Statutes § 46b-146.

police and court records, however, is dependent on the court's determination of the juvenile matter. Id., 560. For example, if the court dismissed the charge filed against the juvenile, then the police and court records concerning the juvenile matter are erased automatically and such erasure is mandatory. Id. On the other hand, if the juvenile is adjudicated as a delinquent and dismissed from further accountability to the court, then erasure occurs only upon the court's receipt of a petition on behalf of the juvenile, provided that the other statutory conditions are satisfied. Id. Our Supreme Court concluded that the "respondent [was] entitled to challenge the propriety of his adjudication of delinquency . . . ." Id.; see also *In re Juvenile Appeal (83-EF)*, 190 Conn. 428, 429 n.1, 461 A.2d 957 (1983).

In the present case, as in *In re Juvenile Appeal (82-AB)*, supra, 188 Conn. 560, the court discharged the respondent from further accountability to the court. Although the court disposed of the matter by discharging the respondent from further obligation, the court's adjudication of delinquency remains. Therefore, the respondent is entitled to challenge the propriety of his adjudication. See id.

Practice Book § 1062 provided: "Upon receipt of a petition on behalf of any child found to be delinquent for the erasure of records pursuant to [§] 51-327, the court shall conduct such investigation as it may deem appropriate, and if it finds that at least two years have elapsed since the child's last dismissal from court accountability or since his discharge from the custody of the department of children and youth services or of any other institution, agency or department responsible for him by court order, and that no subsequent juvenile proceeding has been instituted against him and that he has not been found guilty of a crime, if such child has reached sixteen within such two year period, it shall order erased all outstanding police records and records concerning juvenile matters pertaining to such child. When a child referred to the court as an alleged delinquent is dismissed, if such child has no prior outstanding and unerased police record or court record pertaining to a delinquency petition, the court shall, without petition by the child, order the immediate and automatic erasure of all court and police records pertaining to such dismissed charge."

Moreover, if we reverse the judgment on the basis of the respondent's claim of evidentiary insufficiency, we can afford the respondent practical relief. Therefore, the respondent's appeal is not moot. Under General Statutes § 46b-146,[7] the current version of the statute discussed in *In re Juvenile Appeal (82-AB)*, supra, 188 Conn. 560, a petition to erase the police and court records may be filed with the Superior Court on behalf of an adjudicated delinquent following a specified amount of time from the juvenile's discharge from supervision of the Superior Court or from the custody of the department of children and families. In contrast to the petition requirement for the erasure of the records of a juvenile adjudicated as a delinquent, § 46b-146 also provides for the automatic and mandatory erasure of the police and court records when the court

---

[7] General Statutes § 46b-146 provides: "Whenever any child has been found delinquent or a member of a family with service needs, and has subsequently been discharged from the supervision of the Superior Court or from the custody of the Department of Children and Families or from the care of any other institution or agency to whom he has been committed by the court, such child, his parent or guardian, may file a petition with the Superior Court and, if such court finds that at least two years or, in the case of a child convicted as delinquent for the commission of a serious juvenile offense, four years have elapsed from the date of such discharge, that no subsequent juvenile proceeding has been instituted against such child, that such child has not been found guilty of a crime and that such child has reached sixteen years of age within such period, it shall order all police and court records pertaining to such child to be erased. Upon the entry of such an erasure order, all references including arrest, complaint, referrals, petitions, reports and orders, shall be removed from all agency, official and institutional files, and a finding of delinquency or that the child was a member of a family with service needs shall be deemed never to have occurred. The persons in charge of such records shall not disclose to any person information pertaining to the record so erased, except that the fact of such erasure may be substantiated where, in the opinion of the court, it is in the best interests of such child to do so. No child who has been the subject of such an erasure order shall be deemed to have been arrested ab initio, within the meaning of the general statutes, with respect to proceedings so erased. Copies of the erasure order shall be sent to all persons, agencies, officials or institutions known to have information pertaining to the delinquency or family with service needs proceedings affecting such child. Whenever a child is dismissed as not delinquent or as not being a member of a family with

dismisses the child as not delinquent. Because the erasure of a juvenile's records does not occur automatically if the court adjudged the juvenile a delinquent, we conclude that through a reversal of the court's judgment, we could afford the respondent practical relief. Upon reversal of the court's judgment, the respondent would not be a delinquent, and, therefore, the erasure of his records would be automatic and mandatory. Accordingly, the respondent's appeal is not moot.[8]

service needs, all police and court records pertaining to such charge shall be ordered erased immediately, without the filing of a petition."

[8] Even if this court could not afford *direct* practical relief to the respondent through a reversal of the judgment of the juvenile court, the respondent's appeal would not be rendered moot necessarily. See *State* v. *McElveen*, 261 Conn. 198, 205, 802 A.2d 74 (2002); *State* v. *Reilly*, 60 Conn. App. 716, 724–25, 760 A.2d 1001 (2000). Our Supreme Court has held that in such a situation, "a controversy continues to exist, affording [this] court jurisdiction, if the actual injury suffered by the [respondent] potentially gives rise to a *collateral injury* from which [this] court can grant relief." (Emphasis added.) *State* v. *McElveen*, supra, 205. As a result, "the collateral consequences doctrine acts as a surrogate, calling for a determination whether a decision in the case can afford the [respondent] some practical relief in the future." Id., 208.

"[F]or a [respondent] to invoke successfully the collateral consequences doctrine, the [respondent] must show that there is a reasonable possibility that prejudicial collateral consequences will occur." Id. "Accordingly, this standard requires the [respondent] to demonstrate more than an abstract, purely speculative injury, but does not require the [respondent] to prove that it is more probable than not that the prejudicial consequences will occur." *Williams* v. *Ragaglia*, 261 Conn. 219, 227, 802 A.2d 778 (2002).

In the present case, the respondent points to several prejudicial collateral consequences that result from the adjudication of delinquency pertaining to access to the records of the juvenile proceedings. Although juvenile records have a presumption of confidentiality pursuant to General Statutes § 46b-124 (c); see also *In re Sheldon G.*, 216 Conn. 563, 571, 583 A.2d 112 (1990); *State* v. *William B.*, 76 Conn. App. 730, 757, 822 A.2d 265, cert. denied, 264 Conn. 918, 828 A.2d 618 (2003); there are exceptions to the confidentiality requirement, which are delineated in the other subsections of the statute. For example, pursuant to General Statutes § 46b-124 (d), the records of cases of juvenile delinquency proceedings "shall be available to (1) judicial branch employees who, in the performance of their duties, require access to such records . . . ." Moreover, the victim of the crime committed by the delinquent shall have access to the records of the delinquency proceedings "to the same extent as the record of the case of a defendant in a criminal proceeding in the regular criminal docket of the

I

The respondent first claims that the petitioner failed to present sufficient evidence to support the court's finding that he committed a breach of the peace in violation of § 53a-181 (a) (1). Specifically, the respondent contends that the petitioner failed to prove that he possessed the requisite intent and that his conduct constituted threatening behavior. We disagree.

We first set forth our standard of review. "When an appeal challenges the sufficiency of the evidence to justify a [finding] of guilty, we have a two fold task. We first review the evidence presented at the trial, construing it in the light most favorable to sustaining the [guilty finding]. . . . We then determine whether the [fact finder] could have reasonably concluded, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Wolff*, 37 Conn. App. 500, 508, 657 A.2d 650 (1995), rev'd on other grounds, 237 Conn. 633, 678 A.2d 1369 (1996).

"In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the [respondent's] innocence. . . .

Superior Court is available to a victim of the crime committed by such defendant. . . ." General Statutes § 46b-124 (f). Section 46b-124 further provides in relevant part in subsection (e) that the "[r]ecords of cases of juvenile matters involving delinquency proceedings, or any part thereof, may be disclosed upon order of the court to any person who has a legitimate interest in the information and is identified in such order. . . ."

Because we conclude that we could afford the respondent practical relief if we reverse the judgment of the trial court and that the respondent's claims are not moot, we do not review whether there is a reasonable possibility of the occurrence of the prejudicial collateral consequences that the respondent alleged in his reply brief. We further note that the collateral consequences mentioned in this footnote may not provide an exhaustive list of the prejudicial collateral consequences that flow from an adjudication of delinquency.

The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Jones-Richards*, 271 Conn. 115, 126, 855 A.2d 979 (2004). "In conducting our review, we are mindful that the finding of facts, the gauging of witness credibility and the choosing among competing inferences are functions within the exclusive province of the [fact finder], and, therefore, we must afford those determinations great deference." (Internal quotation marks omitted.) *State* v. *Fabricatore*, supra, 89 Conn. App. 733.

Pursuant to § 53a-181 (a) (1), the petitioner "bore the burden of proving beyond a reasonable doubt that (1) the [respondent] engaged in fighting or in violent, tumultuous or threatening behavior, (2) that this conduct occurred in a public place and (3) that the [respondent] acted with the intent to cause inconvenience, annoyance or alarm, or that he recklessly created a risk thereof." *State* v. *Simmons*, 86 Conn. App. 381, 386–87, 861 A.2d 537 (2004), cert. denied, 273 Conn. 923, 871 A.2d 1033; cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005). In this appeal, the respondent does not dispute that the incident occurred in a public place, and, therefore, we do not review that element. However, the respondent does dispute the sufficiency of the evidence as to the remaining two elements.

The respondent argues on appeal that there was insufficient evidence demonstrating that he possessed the necessary mens rea to commit the crime of breach of the peace because the petitioner failed to prove that he either intentionally or recklessly inconvenienced, annoyed or alarmed the victim by his conduct. During closing argument, the petitioner acknowledged that there was no evidence that the respondent *intended* to harass or threaten the victim, but the petitioner did contend that there was evidence that the respondent

*recklessly* created a risk of annoyance and alarm to the victim.

General Statutes § 53a-3 (13) provides that "[a] person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." "Thus, the [fact finder] [has] to consider objectively the nature and degree of the risk and the [respondent's] subjective awareness of that risk. Subjective realization of a risk may be inferred from a person's words and conduct when viewed in the light of the surrounding circumstances. LaFave and Scott, Criminal Law (2d Ed.) § 30." (Internal quotation marks omitted.) *State* v. *Davila*, 75 Conn. App. 432, 439, 816 A.2d 673, cert. denied, 264 Conn. 909, 826 A.2d 180 (2003), cert. denied, 543 U.S. 897, 125 S. Ct. 92, 160 L. Ed. 2d 166 (2004). Recklessness, however, "does not involve intentional conduct because one who acts recklessly does not have a conscious objective to cause a particular result." (Internal quotation marks omitted.) *State* v. *Smith*, 35 Conn. App. 51, 64–65, 644 A.2d 923 (1994).

In the present case, the issue is whether pointing a replica .45 caliber handgun at an eleven year old girl from a distance of approximately twenty yards constitutes reckless conduct creating a risk of inconvenience, annoyance or alarm.[9] The evidence taken in the light

[9] In *State* v. *Indrisano*, 228 Conn. 795, 806–15, 640 A.2d 986 (1994), our Supreme Court addressed a vagueness challenge to the mens rea component of the disorderly conduct statute. See General Statutes § 53a-182 (a) ("[a] person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . [e]ngages in fighting or in violent, tumultuous or threatening behavior . . . ."). In doing so, our Supreme Court analyzed the meaning of "inconvenience, annoyance, or alarm . . . ." (Internal quotation marks omitted.)

most favorable to sustaining the adjudication of delinquency shows that the court reasonably could have found beyond a reasonable doubt that the respondent acted recklessly when he pointed his .45 caliber replica handgun at the victim and that this conduct created a risk of inconvenience, annoyance or alarm.

According to Bergean, the respondent informed him that he had pointed his replica, black handgun across the street. Evidence adduced at trial indicated that approximately twenty yards separated the respondent from the victim and her brother, who were located across the street from the respondent. Furthermore, the respondent's witness, who had been playing with the respondent during the incident, acknowledged that the victim and her brother were playing across the street from the respondent's house. The court reasonably could have inferred from the respondent's conduct that he was aware that pointing a pellet gun, which was a replica .45 caliber handgun, across the street to where two children were playing twenty yards away from him, could create a risk of alarm.

Moreover, on the basis of an objective analysis of the nature and degree of risk, we conclude that the court had sufficient evidence to adjudicate the respondent as a delinquent for committing a breach of the peace. The pellet gun resembled a modern looking handgun and was a replica of a Double Eagle 2000, .45 caliber handgun. Bergean testified that from a distance of twenty yards, he would be unable to determine whether the pellet gun was a real handgun. After seeing the respondent point what appeared to be a real handgun at her,

*State* v. *Indrisano,* supra, 810. Because the language in § 53a-182 (a) mirrors the language of General Statutes § 53a-181 (a), we note that our Supreme Court stated: "Webster's Third New International Dictionary includes the following among the meanings of the three statutory terms: 'inconvenience'—something that disturbs or impedes; 'annoyance'—vexation; a deep effect of provoking or disturbing; and 'alarm'—fear; filled with anxiety as to threatening danger or harm." Id.

the victim became alarmed and upset and cried, prompting her mother to observe the actions of the respondent. Thereafter, the victim's mother, who could not discern definitively whether the respondent's gun was a real handgun, reported the incident to the police. Accordingly, the respondent's disregard of the risk of alarm created by his actions reasonably could be considered a "gross deviation" from the conduct of a reasonable person in such a situation, and, therefore, there was sufficient evidence to support the adjudication of delinquency. See General Statutes § 53a-3 (13).

The respondent further argues that there was insufficient evidence that he engaged in threatening behavior because the petitioner failed to establish that the respondent "intended to place [the victim] in fear" or that "[the respondent's] conduct involved actual physical violence or portended physical violence as required by [the] breach of peace statute." The respondent, citing General Statutes § 53a-62, first argues that in order to establish threatening conduct, the petitioner was required to establish that the respondent intended the harm. We note that the statute cited by the respondent also might be violated by reckless conduct. General Statutes § 53a-62 (a) (3). The respondent's reply brief, however, tracks the words from subdivision (1) of subsection (a) of § 53a-62, which requires intentional conduct. We see no need for further analysis of that claim since we are bound to follow our Supreme Court's established construction in *State* v. *Szymkiewicz*, 237 Conn. 613, 678 A.2d 473 (1996). We, therefore, again conclude that a person can be convicted of breach of peace when he acts recklessly with respect to a result or circumstance.

The respondent also contends that his conduct did not constitute threatening behavior as defined by the breach of the peace statute. Our Supreme Court, in order to ascertain the meaning of § 53a-181 (a) (1),

looked to the construction given by this court in *State* v. *Lo Sacco*, 12 Conn. App. 481, 490, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987), to identical language contained in General Statutes § 53a-181a (a) (1), the public disturbance statute. See *State* v. *Szymkiewicz*, supra, 237 Conn. 618. In *State* v. *Lo Sacco*, supra, this court stated that " '[t]hreatening' is defined as a 'promise [of] punishment' or, 'to give signs of the approach of (something evil or unpleasant).' [Webster, Third New International Dictionary.] When, [however] two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases under the doctrine of noscitur a sociis. . . . Placed within the context of the other words in the statute, the word 'threatening' takes on a more ominous tone. The statute proscribes 'engaging in fighting or in violent, tumultuous, or threatening behavior.' In *State* v. *Duhan*, [38 Conn. Sup. 665, 668, 460 A.2d 496 (1982), rev'd on other grounds, 194 Conn. 347, 481 A.2d 48 (1984)], the Appellate Session of the Superior Court defined 'tumultuous' as 'riotous' and 'turbulent.' Fighting, by its plain meaning, involves physical force. . . . [T]he language of subdivision (1) of General Statutes § 53a-181a (a) . . . evinces a legislative intent to proscribe conduct which actually involves physical violence or portends imminent physical violence." (Citations omitted.)

The court reasonably could have concluded that the respondent's act of pointing a replica .45 caliber handgun at the victim constituted threatening behavior as such conduct portends the presence of imminent physical violence. Furthermore, testimony at trial indicated that the respondent's black pellet gun looked like a modern handgun and was a replica of a Double Eagle 2000, .45 caliber handgun. Bergean also testified that the respondent admitted to pointing the gun across

the street. Although the respondent denied pointing his replica .45 caliber handgun at anyone, the victim, who was standing across the street from the respondent, testified that the respondent pointed the gun at her and her brother, causing her to become scared and upset. Presented with this evidence, we conclude that the court reasonably could have found that the respondent engaged in threatening behavior when he pointed an imitation .45 caliber handgun at the victim from a distance of approximately twenty yards.

Accordingly, there was sufficient evidence for the court to conclude that the respondent committed a breach of the peace in violation of § 53a-181 (a) (1).

II

The respondent further claims that the court failed to inquire into his complaints pertaining to a breakdown of the attorney-client relationship. We disagree.

The following additional facts are relevant to our resolution of the respondent's claim. The respondent initially was represented by a different attorney, but at some point prior to the in-court review hearing, attorney Matthew Collins was appointed by the court to represent the respondent in the delinquency proceedings. Collins first appeared on behalf of the respondent at the June 15, 2004 in-court review hearing; however, the hearing was continued because the respondent failed to attend, and, instead, only the respondent's father attended the hearing. Although Collins had been the respondent's counsel for, at most, two weeks at the time of the June 15, 2004 proceeding, the respondent's father stated that he had not yet met with Collins, to which Collins responded that a meeting was scheduled for the following Monday. On July 28, 2004, the respondent and his father appeared for the rescheduled in-court review hearing, which again was continued until September 7, 2004, the date of the trial. The respondent

and his father failed to appear at the commencement of the trial on September 7, 2004, and, therefore, the court issued a subpoena, compelling the respondent and his father to appear at court on September 28, 2004, for the rescheduled trial.

Despite their receipt of the subpoena, which indicated the date and time of the trial, the respondent and his father arrived one hour and fifteen minutes late to court on September 28, 2004. When the respondent's father arrived, he stated that he wanted another attorney because Collins had met with the respondent on only one occasion. Collins replied that he had met with the respondent and that he also had sent a letter informing the respondent and his father of the date and time of the trial and urging them to call him. The respondent's father acknowledged that Collins had met with them following the July 28, 2004 hearing but asserted that Collins was not prepared to commence the trial. After listening to the concerns of the respondent's father, the court asked Collins if he had met with the respondent, to which Collins replied that he had met with both the respondent and his father. The court then informed the respondent's father that he could hire a different attorney if he wanted. Thereafter, the court continued the commencement of the trial, and Collins stated on the record that he was available to meet with the respondent and his father at any time.

The trial then was rescheduled for October 19, 2004. However, the trial did not commence on that date because a hearing was held concerning Collins' motion for the appointment of a guardian ad litem. At the October 19, 2004 proceeding, the respondent's father voiced his opposition to the motion and also complained that Collins had not met with the respondent. Collins responded that since the last court appearance on September 28, 2004, an appointment had been scheduled; however, the respondent failed to attend that meeting.

Instead, only the respondent's father arrived at Collins' office, and, during the meeting, the respondent's father became very hostile, and Collins threatened to call the police. In addition, the respondent's father asserted that Collins was unprepared for trial because he did not telephone the witnesses from the list that the respondent's father had provided to Collins. The court, after listening to the complaints of the respondent's father, appointed a guardian ad litem. Collins offered to discuss the case with the respondent after the hearing, but the respondent's father refused to have his son meet with Collins. The court scheduled the trial for December 7, 2004.

Before the presentation of evidence at the trial on December 7, 2004, Collins noted the lack of communication between him and the respondent. The respondent's father contended that Collins was uncooperative because he had not met with them recently to discuss the case and also that Collins was unprepared for trial. The respondent stated that he did not want Collins to represent him. After allowing the respondent's father and the respondent an opportunity to voice their displeasure, the court noted that Collins had offered to meet with them at the close of the October 19, 2004 proceeding but that the respondent's father had rejected Collins' invitation. Subsequently, the court decided to proceed to the trial.

At the close of the first day of trial and after Bergean had been excused from the witness stand, the respondent asserted that he had some questions to ask Bergean. The court informed the respondent that he could not ask additional questions of the excused witness because he had an attorney. The court also noted that during Bergean's testimony, it had observed the respondent passing notes to Collins, which Collins subsequently examined, and also it noticed the respondent conferring with Collins.

The trial was continued until January 11, 2005, and, prior to resuming the presentation of evidence, Collins made a motion to withdraw his appearance because the respondent and his father refused to contact him and criticized his preparedness for trial. The respondent's father again stated his displeasure with Collins. The court, noting that it was the middle of the trial and that the concerns of the respondent's father already had been discussed, denied the motion for the withdrawal of Collins, and the trial continued. Later in the trial, the respondent indicated that he wanted to testify. After meeting with Collins outside of the courtroom in order to discuss the perils of testifying, however, the respondent decided not to testify.

On February 8, 2005, the court issued a written decision, but the respondent and his father failed to appear before the court. A dispositional hearing was scheduled for March 15, 2005. However, the court could not conduct the March 15, 2005 dispositional hearing because the respondent and his father failed to attend a predispositional study. On March 15, 2005, Collins indicated that because the guardian ad litem was not in attendance, he would prefer a continuance. The dispositional hearing occurred on April 5, 2005, and the court discharged the respondent without further obligation to the court.

The respondent claims that the court improperly failed to inquire adequately into his complaints about his court-appointed counsel when it repeatedly denied his requests for the appointment of new counsel.[10]

---

[10] In this appeal, the respondent does not claim that the trial court improperly failed to appoint new counsel. We note, however, that "[t]here is no unlimited opportunity to obtain alternate counsel. . . . It is within the trial court's discretion to determine whether a factual basis exists for appointing new counsel. . . . Moreover, absent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error." (Citations omitted; internal quotation marks omitted.) *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987); see also *State* v. *Gonzalez*, 205 Conn. 673, 683, 535 A.2d 345 (1987).

As a preliminary matter, we identify the applicable standard of review and set forth the legal principles that govern our resolution of the respondent's claim. "[A] trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel . . . . The extent of that inquiry, however, lies within the discretion of the trial court. . . . A trial court does not abuse its discretion by failing to make further inquiry where the [respondent] has already had an adequate opportunity to inform the trial court of his complaints." (Internal quotation marks omitted.) *State* v. *Robert H.*, 71 Conn. App. 289, 306, 802 A.2d 152 (2002), aff'd, 273 Conn. 56, 866 A.2d 1255 (2005); see also *State* v. *High*, 12 Conn. App. 685, 688–89, 533 A.2d 1217 (1987), cert. denied, 207 Conn. 801, 540 A.2d 74 (1988).

"If [the respondent's] eruptions at trial, however, [fall] short of a seemingly substantial complaint . . . the trial court need not inquire into the reasons underlying the [respondent's] dissatisfaction with his attorney." (Internal quotation marks omitted.) *State* v. *Robinson*, 227 Conn. 711, 725, 631 A.2d 288 (1993).

We find informative the case of *State* v. *Robinson*, supra, 227 Conn. 722–28. In *Robinson*, the defendant had had several disputes with his attorney, Brian Karpe, concerning trial tactics and also complained that Karpe had failed to come to prison to consult with him about his case. Id., 722. As a result of the defendant's repeated expressions of dissatisfaction with his services, Karpe moved to withdraw during jury selection, but the court denied the motion. Id., 722–23. Prior to resuming jury selection two days later, Karpe again moved to withdraw from the case because the defendant told Karpe that he was unprepared and also because Karpe believed that the attorney-client relationship had broken down. Id., 723. The court again denied the motion. Id. On the following day, during jury selection, Karpe

moved to withdraw because the defendant refused to speak with him, and the court denied Karpe's motion. Id., 723–24. Thereafter, at the commencement of the state's presentation of evidence, Karpe again moved to withdraw, and the motion was denied. Id., 724. After the presentation of the evidence, the defendant continued to voice his displeasure with Karpe. Id.

On appeal, the defendant in *Robinson* claimed that "the trial court failed to make an adequate inquiry into his complaints about his attorney." Id., 722. Our Supreme Court noted that "despite the fact that [the defendant's] complaints were not 'seemingly substantial,' . . . the record reveal[ed] that the trial court permitted the defendant an opportunity to inform fully the court of his grievances, treated them as important and took appropriate action where necessary or possible." Id., 726. Our Supreme Court concluded that "the trial court, having been informed of the nature of the defendant's complaints . . . was not thereafter required continually to halt the trial and to inquire further into the defendant's incessant complaints over his attorney's performance unless they were different and seemingly substantial." Id. In addition, our Supreme Court also disagreed with the defendant's contention that the court was required to conduct a more probing inquiry into the cause of the breakdown in the attorney-client relationship, concluding instead that the attorney-client relationship had endured as evidenced by Karpe's articulations to the court of the defendant's concerns and motions made at the request of the defendant. Id., 727.

In the present case, as in *Robinson*, the court allowed the respondent and his father ample opportunity to inform the court of their complaints and treated them as important. On several occasions, the court permitted the respondent's father to voice his displeasure with Collins' services. The record reveals that the court repeatedly permitted the respondent and his father not

only to state their complaints, but also allowed them an opportunity to articulate the facts underlying their displeasure, namely, that Collins had failed to meet with the respondent and was unprepared for trial.[11]

For example, during the September 28, 2004 proceeding, the respondent's father complained that Collins had not met with the respondent. After listening to the incessant complaints of the respondent's father, the court asked Collins if he had met with the respondent. Collins acknowledged that he had met with the respondent and his father. In consideration of the concerns of the respondent's father, the court thereafter continued the commencement of the trial in order to provide additional time for the respondent to consult with Collins. However, following the September 28, 2004 proceeding, the respondent's father failed to bring the respondent to Collins' office for a scheduled meeting and, instead, went by himself.

During the next proceeding, which occurred on October 19, 2004, the court again permitted the respondent's father to voice, at length, his dissatisfaction with Collins. The respondent's father complained that Collins had not met with the respondent recently and was not prepared for trial. After listening to the complaints of the father, the court took action and granted Collins' motion to appoint a guardian ad litem to represent the interests of the respondent. Furthermore, the record reveals that Collins offered to meet with the respondent after the proceeding, but the respondent's father rebuffed Collins' overture. The respondent's father made the same complaints again on December 7, 2004,

---

[11] The respondent's father based his complaint concerning Collins' lack of preparedness for trial on the fact that Collins did not telephone the witnesses on the list that the father provided to him. We note that "[d]ifferences of opinion over trial strategy are not unknown, and do not necessarily compel the appointment of new counsel." *State* v. *Drakeford*, 202 Conn. 75, 83, 519 A.2d 1194 (1987).

and, the court, after listening to the unvarying criticisms from the respondent's father along with Collins' acknowledgement of a lack of communication, decided to proceed to trial, noting how the respondent's father had decided not to meet with Collins at the close of the prior proceeding.

Despite the assertion to the contrary, it appears that the attorney-client relationship endured. See *State* v. *Robinson*, supra, 227 Conn. 727. On December 7, 2004, the court commented on the record that it had observed the respondent passing notes to Collins and conferring with Collins during Bergean's testimony. Furthermore, after conferring outside of the courtroom with Collins about the perils of testifying, the respondent decided not to testify in his defense. Although the respondent and Collins had not met formally to discuss the case since the summer of 2004, the record reveals that a total breakdown in communication did not occur, notwithstanding the persistent efforts of the respondent's father to thwart any attempted meetings between the respondent and Collins. We further note that "a [respondent] does not possess the right to demand the appointment of alternate counsel simply on the ground of a breakdown of communication, which the [respondent] induced." *State* v. *Robert H.*, supra, 71 Conn. App. 306.

Our review of the record reveals that the court, having been informed of the respondent's complaints, conducted a sufficient inquiry into the facts underlying the respondent's dissatisfaction and took appropriate action where necessary. Because the respondent and his father repeatedly voiced the same concerns, it is difficult to imagine that additional grounds for dissatisfaction would have been gleaned by the court through a more probing inquiry. See *State* v. *High*, supra, 12 Conn. App. 689. Moreover, the court's tolerance of the complaints of the respondent and his father concerning Collins "evinc[es] a high degree of judicial solicitude"

toward their concerns. *State* v. *Robinson*, supra, 227 Conn. 727.

"Although we believe that a trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel"; id., 726; we conclude that, in the present case, the court was not required to conduct a more detailed inquiry. The respondent already had a sufficient opportunity to inform the court of the nature of his complaints. Accordingly, we conclude that the court made an adequate inquiry into the respondent's complaints and did not abuse its discretion in not conducting a further inquiry.

### III

The respondent's final claim in this appeal concerns the trial court's appointment of a guardian ad litem.[12] Specifically, the respondent argues that the trial court improperly appointed a guardian ad litem and that the court "fail[ed] to educate the guardian [ad litem] as to her particular role and to question her as a witness as to what she recommended was in the best interest of the respondent."[13]

---

[12] General Statutes § 45a-132 provides in relevant part: "(a) In any proceeding before . . . the Superior Court . . . the judge . . . may appoint a guardian ad litem for any minor . . . if it appears to the judge . . . that one or more persons as individuals, or as members of a designated class or otherwise, have or may have an interest in the proceedings, and that one or more of them are minors . . . at the time of the proceeding.

"(b) The appointment shall not be mandatory, but shall be within the discretion of the judge . . . .

"(d) Any appointment of a guardian ad litem may be made with or without notice and, if it appears to the judge . . . that it is for the best interests of a minor having a parent or guardian to have as guardian ad litem some person other than the parent or guardian, the judge . . . may appoint a disinterested person to be the guardian ad litem. . . ."

[13] Although the respondent claims that the court's failure to question the guardian ad litem about her recommendation as to the best interest of the respondent was improper, the guardian ad litem informed the court in a letter that she believed that it was in the respondent's best interest not to proceed with the trial. Despite the guardian ad litem's recommendation, the respondent's case was tried as the respondent and his father desired.

We first set forth additional facts that are necessary for our resolution of this claim. Collins filed a motion for the appointment of a guardian ad litem on October 14, 2004, because the respondent's father "failed to appear with [the respondent] on the past two trial dates, to the prejudice of [the respondent's] defense . . . failed to bring [the respondent] to a previously scheduled office visit for the purposes of trial preparation [and] refuses to consider or even discuss the resolution of [the respondent's] Juvenile Court matter short of trial." On October 19, 2004, instead of commencing the trial as previously scheduled, the court held a hearing concerning Collins' motion. After the respondent's father acknowledged that he had failed to bring the respondent to a scheduled meeting, the court granted the motion and appointed a guardian ad litem. The respondent did not object to the appointment of a guardian ad litem.

Thereafter, the court appointed attorney Trudy Condio as the appointed guardian ad litem. Condio did not attend the first day of the respondent's trial because she had a prior commitment; however, she submitted a letter to the court. In the letter, Condio indicated that she had reviewed the police report and the court file and had discussed the matter with Collins and with the prosecutor. The letter further stated that the actions of the respondent's father were detrimental to the respondent, and she questioned "whether [the respondent's father] has [the respondent's] best interest at heart by stonewalling the process and insisting to continue with a trial." Condio recommended that it was in the best interest of the respondent "not to proceed with the trial but to work through a resolution." Condio appeared at court on the second, and final, day of the trial on January 11, 2005.

Condio did not attend the hearing on March 15, 2005. The respondent requested that the court replace the court-appointed guardian ad litem with his father, but

the court denied his request. Because the respondent failed to attend the required predispositional study and because Condio could not attend the March 15, 2005 hearing, the court continued the dispositional hearing. Condio did attend the dispositional hearing, which was held on April 5, 2005.

A

The respondent claims that the court's appointment of a guardian ad litem was improper as it violated his common law right, statutory right and constitutionally protected right to have his father act as his guardian ad litem.[14]

At the outset, the respondent concedes that his claim that the court improperly appointed a guardian ad litem was not preserved at the trial court and seeks to prevail under the test set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

"Under *Golding*, a [respondent] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is

_____

[14] The respondent argues, in part, that his father had a constitutional right to act as his guardian ad litem. In response, the petitioner argues that the respondent lacks standing to assert the constitutional rights of his father in claiming that the court improperly appointed a guardian ad litem. We agree with the petitioner.

"We have uniformly resisted the efforts of litigants to assert constitutional claims of others not in a direct adversarial posture before the court. . . . Under long established principles, a party is precluded from asserting the constitutional rights of another." (Internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 665, 881 A.2d 1005 (2005). "If a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it." (Internal quotation marks omitted.) *In re Christina M.*, 280 Conn. 474, 480, 908 A.2d 1073 (2006).

We conclude that the respondent does not have standing to assert the constitutional rights of his father, and, therefore, we lack subject matter jurisdiction.

adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [respondent] of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Emphasis in original; internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 89–90, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007).

The respondent asserts that "[t]he second and third prongs of *Golding*, requiring a claim of constitutional magnitude, are satisfied because the respondent was deprived of *his* fundamental right to have his father act as his guardian ad litem, a right protected under the substantive due process clause of the fourteenth amendment." (Emphasis added.) To support his contention that the appointment of a guardian ad litem amounted to a violation of *his* constitutional right to have his father act as his guardian ad litem, the respondent, in his main brief, cites to federal case law recognizing the fundamental liberty interest of *parents* in the custody, care and control of their children. See, e.g., *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000); *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925).

We are unpersuaded. The respondent, in fact, acknowledges in his reply brief that because he was "unable to find any legal authority holding that a child

has a constitutionally protected liberty interest in having his parent act as his guardian in delinquency proceedings, [he] cited legal precedent for the recognized liberty interest enjoyed by parents."[15] Because the respondent cites no authority that would extend a parent's constitutional right to a child, we conclude that the respondent has failed to satisfy *Golding*'s second prong.[16]

### B

The respondent further claims that the court improperly failed to educate the court-appointed guardian ad litem about her role and duties. We disagree.

The respondent states that "[t]he record lacks any indication that the trial court instructed the guardian ad litem as to her duties and responsibilities in this case" and argues that the failure to articulate the responsibilities of the guardian ad litem was improper. We do not agree.

The respondent relies on *In re Tayquon H.*, 76 Conn. App. 693, 821 A.2d 796 (2003), to support his argument that the court improperly failed to instruct the guardian ad litem about her role and duties. In that case, this court noted that "[t]he duties of the guardian ad litem . . . are contextually specific to the case at hand, and the scope of those duties should be set by the trial court

---

[15] Further, we note that "[a]lthough the [United States] Supreme Court has recognized many constitutional rights for children, children's rights remain limited in comparison to those of adults, and they are easily trumped within the family and subsumed under the rights of parents." T. Ezer, "A Positive Right to Protection for Children," 7 Yale Hum. Rts. & Dev. L.J. 1, 10 (2004); see generally T. Dodds, "Defending America's Children: How the Current System Gets it Wrong," 29 Harv. J.L. & Pub. Policy 719, 726–31 (2006).

[16] Insofar as the respondent argues that he has a common-law right and a statutory right to have his father act as his guardian ad litem, we conclude that the respondent has failed to provide any analysis demonstrating that this claim is constitutional in nature as required under *Golding*'s second prong. Accordingly, we decline to review this claim.

judge and communicated to the guardian ad litem." Id., 708. In *In re Tayquon H.*, this court further stated that "[a] guardian ad litem . . . is always subject to the supervision and control of the court, and he may act only in accordance with the instructions of the court." (Internal quotation marks omitted.) Id., 708 n.19.

On the basis of our review of the record, we conclude that the court did delineate the duties of the guardian ad litem in this juvenile matter in its notice of appointment. Following the hearing concerning the appointment of a guardian ad litem, the court issued a form, entitled "Notice of Appointment, Guardian Ad Litem, Child/Youth" on October 26, 2004, in which the court appointed Condio to serve as the guardian ad litem. The form states, in part, that "[t]he Guardian Ad Litem shall have such powers and duties for the purposes of this specific petition as the ward or the natural guardian could exercise in the absence of a legal guardian," that "[t]he Guardian Ad Litem may appear at all proceedings to this litigation to assure representation of the best interest of the ward," that "[b]ased upon an independent evaluation of the best interest of the child/youth, the Guardian Ad Litem shall file reports of findings and recommendations as part of the dispositional hearings as deemed necessary or as directed by the Court" and that "[t]he Guardian Ad Litem shall seek cooperative solutions on behalf of the best interest of the ward." Moreover, before the commencement of the second day of trial, the guardian ad litem sought clarification, on the record, that her role during the proceeding was to act as a witness, to which the court replied in the affirmative. We conclude, therefore, that the responsibilities of the guardian ad litem were communicated to the guardian ad litem.

The judgment is affirmed.

In this opinion the other judges concurred.