STATE OF CONNECTICUT *v.* MIGUEL ARROYO
(SC 17804)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

598

Argued March 12—officially released December 11, 2007

*Giovanna Shay,* with whom were *Efren Olivares* and *Brett Dignam,* law student interns, and, on the brief, *Allegra McLeod* and *Jason Smith,* law student interns, for the appellant (defendant).

*John A. East III,* senior assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Michael Pepper,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Miguel Arroyo, appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts each of the crimes of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A), and risk of injury to a child in violation of General Statutes § 53-21 (2), and with one count each of the crimes of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (2), attempt to commit sexual assault in the fourth degree in violation of §§ 53a-49 (a) (2) and 53a-73a (a) (1) (A), and attempt to commit risk of injury to a child in violation of §§ 53a-49 (a) (2) and 53-21 (2). The defendant claims that the trial court improperly: (1) precluded the admission of certain third party culpability evidence proffered by the defendant and denied the defendant's request for a third party culpability charge; (2) admitted statements of a forensic interviewer under

---

[1] The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the case from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

the medical diagnosis or treatment exception to the hearsay rule; (3) admitted the testimony of the victim's teacher under the constancy of accusation doctrine; (4) admitted the victim's videotaped testimony, as well as the testimony of certain witnesses recounting the victim's out-of-court statements in violation of *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); (5) failed to inquire adequately into the defendant's complaints of lack of communication with his attorney; and (6) failed to inform the defendant of his right to consular notification under the Vienna Convention on Consular Relations.[2] Because we agree with the defendant that the court improperly declined to give the requested third party culpability charge, we reverse the judgment of conviction and remand the case to the trial court for a new trial.[3]

---

[2] In asserting this claim, the defendant relies on article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820 (1970). The United States Supreme Court recently considered some of the procedural issues presented by article 36, and explained generally that it "concerns consular officers' access to their nationals detained by authorities in a foreign country." *Sanchez-Llamas* v. *Oregon*, 548 U.S. 331, 338, 126 S. Ct. 2669, 165 L. Ed. 2d 557 (2006). Article 36 (1) (b) of the Vienna Convention provides in relevant part: "[I]f [the detained foreign national] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. . . ." The court explained: "In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests." *Sanchez-Llamas* v. *Oregon*, supra, 338–39. Article 36 (1) (b) of the Vienna Convention also requires the detaining authorities to "inform the person concerned without delay of his rights under this subparagraph . . . ."

[3] Although we resolve the present appeal based on our conclusion that the trial court improperly declined to instruct the jury on the defendant's third party culpability defense, we address the remaining claims raised by the defendant because they are likely to arise on remand. Because, however, the defendant's final claim, which alleged that the trial court improperly failed to inform the defendant of his right to consular notification, is inadequately briefed, we decline to address it. See, e.g., *Celentano* v. *Rocque*, 282 Conn. 645, 659, 923 A.2d 709 (2007).

The jury reasonably could have found the following facts. The victim's parents, who are originally from Cuba, met the defendant, also a native of Cuba, at Guantanamo Naval Base before emigrating to the United States. Eventually, the parents asked the defendant to be the godfather to their two children, the victim and her younger brother. During the relevant time period, between late November, 2001, and May 23, 2002, the defendant occasionally slept at the home of the victim, who was five years old at the time of these events. Also during that time period, the victim's father, who had been living out of state, returned to live with the family as of December 10, 2001. Upon his return, he and the victim's mother resumed having unprotected sex.

Sometime toward the end of November, 2001, the victim complained to her mother about irritation in her vaginal area. When her mother examined the victim, she observed that the area was discolored. Thinking that the irritation was caused by the liquid soap she had been using, the mother disposed of the soap. When the irritation persisted, the mother brought the victim to Yale-New Haven Hospital on December 19, 2001, where the victim was examined and given medication. During the examination, the victim complained that she had been feeling pain during urination for several days. On the basis of the reported symptoms, the victim was tested for a urinary tract infection and treated with Amoxicillin. Shortly thereafter, on December 27, 2001, the victim's mother was admitted to the hospital with a high fever and abdominal pain and was diagnosed with a kidney infection. While in the hospital, the mother was tested and treated presumptively for chlamydia. When the test results came in, they were negative. She was discharged on December 31, 2001, and returned home that day.

On January 15, 2002, the victim's mother once again brought the victim to the hospital because the victim's

vaginal area had become swollen and had been secreting discharge, and because the victim continued to experience painful urination, with traces of blood in her urine. Hospital personnel examined her, then administered testing the next day. On January 18, 2002, the hospital informed the victim's mother that the victim had tested positive for chlamydia. At that point, the victim was given a one time dose of Azithromycin. Following treatment, although the victim's symptoms at times were less severe, they persisted until at least May 15, 2002, when the mother brought her back for further testing and treatment.

Between January 18, 2002, and May 23, 2002, when the victim finally identified the defendant as her attacker, the victim was interviewed by various hospital personnel, social workers and her kindergarten teacher. Catherine Hammie, an investigator for the department of children and families (department), conducted the first interview of the victim, which was a home interview that took place sometime in late January. At that time, the victim denied that anyone had touched her "private parts." Nevertheless, on the basis of the victim's positive chlamydia test, Hammie requested that all of the adults living in the household, the mother, the father and the defendant, obtain testing for chlamydia.[4] Hammie returned a number of times for further interviews, and on February 13, 2002, brought the victim to the Yale Sexual Abuse Clinic (clinic) at Yale-New Haven Hospital, where the victim was examined by Janet Murphy, a pediatric nurse practitioner at the hospital. Murphy did not observe any discharge from the victim's vaginal area at that time, but was unable to perform a

[1] The mother tested negative for chlamydia in April, 2002. Because he lacked health insurance, the father initially refused to go for testing. In mid-April, after Hammie arranged for him to be tested for free, the father took the test and tested negative for chlamydia. The defendant tested negative for chlamydia in June, 2002.

test for chlamydia because the victim was very fearful of being subjected to the test again.

On March 13, 2002, Hammie brought the victim back to the clinic for an interview with Theresa Montelli, a licensed clinical social worker and forensic interviewer[5] who worked at the clinic. At the beginning of the interview, the victim told Montelli that she had become infected in her vaginal area from bathing with her brother. She did not at that time claim that the defendant had made any sexual contact with her. During that interview, she stated only that the defendant sometimes played tickle games with her. When Montelli asked the victim to tell her something she did not like about the defendant, however, Montelli observed that the victim's eye contact ceased and her entire aspect changed markedly, from friendly and carefree to very sad.

After the interview with Montelli was finished, Hammie spoke with the victim. During that conversation, the victim told Hammie that the defendant played hide and seek, and tickle games with her. When Hammie asked the victim what it was she did not like about the defendant, the victim did not reply, but became very sad and quiet. Hammie also asked the victim whether she had ever seen the defendant change his clothes in front of her, and the victim replied that she had not.

On the following day, Montelli again interviewed the victim. When Montelli resumed asking questions about the defendant, the victim responded that she did not want to talk about him. Because the victim had mentioned on the prior day that she had a secret, Montelli asked her about it. The victim said that her secret was about "dancing with daddy." When Montelli asked her once again about the defendant, the victim's aspect changed, and she said that she did not want to talk

---

[5] A forensic interviewer conducts interviews with children who have made allegations of sexual abuse.

about it anymore and that her mother had told her not to say anything.[6]

On May 15, 2002, because the victim's symptoms of vaginal discharge and irritation had become more severe, the mother brought her to the clinic to see Murphy, who examined the victim and tested her for chlamydia. The results were positive. The victim was treated again with Azithromycin, this time over a course of five days. When she was tested for chlamydia again in June, the results were negative.

On May 23, 2002, the victim's mother brought her to meet with Magdalis Gonzalez, the victim's kindergarten teacher, and asked Gonzalez to speak to the victim in order to find out how she had become infected. Gonzalez agreed to speak to the victim privately. During their meeting, Gonzalez first asked the victim if her father had touched her. The victim responded that he had not, and that it was her godfather, the defendant, who had touched her. After her meeting with the victim, Gonzalez called the department and spoke to Hammie, informing her of the victim's allegations. Hammie then went to the school, invoked an administrative hold on the child, and immediately brought her to the clinic for a third interview with Montelli.

During the interview, the victim described three separate occasions on which the defendant had sexual contact with her. The victim said that all three incidents had occurred in the upstairs of the family home.

During her videotaped testimony, the victim described the three incidents. The first incident occurred during the daytime, in her parents' bedroom, where the defendant slept when he stayed at the house

---

[6] The details of this interview are set forth in greater depth in part I of this opinion.

overnight.[7] While the mother was downstairs and the victim's brother was sleeping in his crib in the children's bedroom, the defendant removed his pants, the victim's pants and panties, then penetrated the victim vaginally with his penis. The second occasion occurred in the morning, when the mother was downstairs making chocolate milk for the victim and her brother, who was in his crib. The defendant came into the children's bedroom and got on top of the victim while she was lying down on her back in her bed. The victim was wearing shorts and a shirt, and the defendant had on boxers. The victim told the defendant that her mother was coming, and the defendant left the room and closed the door behind him. The third incident happened when the victim was watching television in the children's bedroom while her brother was sleeping in his crib. The mother was downstairs, and the defendant was in the parents' bedroom. He called the victim into the parents' bedroom, took off his pants and the victim's pants and penetrated the victim vaginally with his penis. Afterwards, the victim returned to the children's bedroom. In her videotaped testimony, the victim stated that the defendant told her, following the first and third incidents, that he would kill her mother if the victim told her mother what had happened.

Immediately following the victim's interview with Montelli, Hammie took the victim to Boys' Village safe home (Boys' Village), where she stayed for fifteen days. When Hammie brought the victim to Boys' Village, the victim cried and begged Hammie to take her home.

---

[7] The victim's mother testified that there were two bedrooms in the house, both on the second floor. The victim and her brother shared one bedroom, and, when the father was home, he and the mother occupied the other bedroom. On nights when the defendant slept in the house, however, the mother slept in the children's bedroom and the defendant slept in the parents' bedroom. When both the defendant and the father slept in the house, the father slept downstairs on the sofa, while the defendant slept in the parents' bedroom and the mother slept in the children's bedroom.

The state charged the defendant by means of a long form information with two counts each of sexual assault in the first degree, sexual assault in the fourth degree and risk of injury to a child, and one count each of attempt to commit sexual assault in the first degree, attempt to commit sexual assault in the fourth degree and attempt to commit risk of injury to a child. Following a jury trial, the defendant was convicted on all counts. This appeal followed. Further facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly refused to deliver a third party culpability charge.[8] We agree with the defendant.[9]

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evi-

[8] The substance of the charge requested by the defendant provided as follows: "The defendant has introduced evidence which indicates that a third party and not the defendant, committed the crime with which the defendant is charged. In order to consider a third party defense the defendant must show some evidence which directly connects a third party to the crime with which the defendant is charged. It is not enough to show that another had the motive to commit the crime. Nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is charged. However, if the defendant shows evidence which directly connects that third party with the crime then you are permitted to consider third party culpability. In this case there has been evidence that the father . . . and the child victim had a secret that involved her body and that the mother of the child threatened her not to say anything to anybody. There is also evidence that the father did have opportunity to commit the sexual assault on the child since the sexually transmitted disease was not found until January 16, 2002."

[9] Our conclusion that the trial court improperly declined to instruct the jury on third party culpability renders it unnecessary for us to review the defendant's claim challenging four rulings of the trial court precluding the introduction of testimony that was offered to support the defendant's third party culpability defense. The trial court precluded that testimony because it concluded that the defendant had not made the required showing to support a defense of third party culpability. We emphasize that we express no opinion regarding whether some other evidentiary rule may or may not justify the exclusion of the testimony in question.

dence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge which is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Internal quotation marks omitted.) *Brown* v. *Robishaw*, 282 Conn. 628, 633, 922 A.2d 1086 (2007).

Although we have often considered the question of whether third party culpability evidence was properly excluded by a trial court; see, e.g., *State* v. *Smith*, 280 Conn. 285, 304, 907 A.2d 73 (2006) (concluding that trial court improperly excluded third party culpability evidence proffered by defendant, that all semen samples recovered from rape kit came from at least two persons, and that defendant and other two accused assailants had been excluded as sources of recovered semen); *State* v. *West*, 274 Conn. 605, 626, 877 A.2d 787 (concluding that trial court properly precluded defendant from introducing unidentified latent finger and palm prints recovered from victims' home; because defendant offered no showing of when prints had been made or who made them, any conclusion that culpable third party made them would involve impermissible speculation), cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 605 (2005); we have not yet considered the question of the standard to be applied to a defendant's request for a jury instruction on third party culpability evidence when such evidence has been introduced. Our existing case law governing the admissibility of third party culpability evidence, as well as basic principles of relevancy and reasonable doubt, lead us to conclude that the very standards governing the admissibility of

third party culpability evidence also should serve as the standards governing a trial court's decision of whether to submit a requested third party culpability charge to the jury.

We first review the standards governing the admissibility of third party culpability evidence. It is well established that "a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 280 Conn. 303–304.

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy." (Internal quotation marks omitted.) *State* v. *Ortiz*, 252 Conn. 533, 564, 747 A.2d 487 (2000). "Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Internal quotation marks omitted.) *State* v. *West*, supra, 274 Conn. 625; Conn. Code Evid. § 4-1. Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated: "Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 280 Conn. 304. In other words, evidence that establishes a direct connection between a third party

and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt.

Given this context, we now turn to the question of the appropriate standards that should govern a trial court's decision to charge the jury on third party culpability evidence. We reiterate that a charge that is an accurate statement of the law, is relevant to an issue in a case and is reasonably supported by the evidence must be given. Because the standards governing the admissibility of third party culpability evidence require that the trial court determine that such evidence be relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt, we conclude that those same standards should govern whether a trial court should give an appropriate instruction on third party culpability. Put another way, if the evidence pointing to a third party's culpability, taken together and considered in the light most favorable to the defendant, establishes a direct connection between the third party and the charged offense, rather than merely raising a bare suspicion that another could have committed the crime, a trial court has a duty to submit an appropriate charge to the jury.

Gauged by this standard, we conclude that the trial court improperly declined to give the requested instruction. Although it is a close case, the third party culpability evidence presented by the defendant, taken as a

whole and considered in the light most favorable to the defendant, was sufficient to establish a direct connection to the victim's father.

The evidence presented at trial that supported the defendant's third party culpability defense was as follows. We begin with the most persuasive, and therefore troubling, evidence that directly connects the father with the crimes, namely, the testimony concerning the victim's "secret." Montelli testified that the victim told her during the March 13 interview that she had a secret. When Montelli asked who else knew the secret, the victim responded that her father did. When Montelli asked the victim if the secret had anything to do with her body, the victim responded that it did, and then identified on a doll the part of her body that the secret involved, namely, an area between the doll's belly and genital area. Although the victim initially denied that the secret was about her father, on the next day, when Montelli resumed the interview, the victim stated that the secret was, in fact, about her father. During this portion of the interview, the victim claimed that the secret she shared with her father was that she played hide and seek with him and danced with him. The victim also stated that she was ashamed to tell Montelli about the secret. Montelli then asked the victim why she was ashamed, and, before the victim responded, also asked if the victim was *afraid* to tell anyone about the secret. The victim responded that, yes, she was afraid to tell the secret. When Montelli asked her why she was afraid, the victim responded that her mother had told her not to tell anyone else about the secret, and that the victim was afraid that if she told, her mother would become angry with her. Montelli also noted that during the time that the victim was telling her about the secret, the victim seemed very nervous.

This testimony—that the victim had a secret that concerned the part of her body between her belly button

and her genital area, a secret that she shared with her father, a secret that was about the fact that she and her father engaged in secret games together, a secret that she was ashamed to tell, a secret that she was afraid to tell because her mother had told her not to tell anyone, a secret that made her nervous when she talked about it—does more than raise a bare suspicion. It suggests a direct connection between the father and the sexual assaults of the victim. This testimony presents the type of third party culpability evidence that would permit a jury, if it had doubt about the credibility of the victim's testimony and the rest of the state's case, to conclude that a reasonable doubt existed as to whether the defendant, rather than the victim's father, committed the crimes.

Other evidence offers further support for the defendant's third party culpability theory. The father had returned home a little more than one month prior to the victim's diagnosis with chlamydia. Specifically, the father returned home on December 10, 2001, nine days before the mother first brought the victim to the hospital on December 19, 2001, and more than one month before the victim was first diagnosed with chlamydia on January 16, 2002. Additionally, the mother testified that, while she was hospitalized from December 27 to December 31, 2001, the father was home with the victim and the victim's brother and took care of them.

Murphy, the nurse practitioner who had examined the victim, testified that, although the average time elapsed before the manifestation of symptoms of chlamydia is ten days, symptoms can begin to show as early as within one week of infection and as late as three weeks after infection. It is possible, therefore, that the father could have infected the victim upon his return home, particularly in light of the fact that the victim was first tested for and diagnosed with chlamydia on January 16, 2002, slightly more than one month after the father had

returned. The timing, therefore, of the father's return home, so close in time to the victim's diagnosis with chlamydia, supports the defendant's third party culpability defense because this testimony, taken together with the father's access to the victim while the mother was hospitalized in late December, 2001, suggests that the father had the opportunity to infect the child with chlamydia.[10]

Another piece of evidence that supports the defendant's third party culpability theory is the victim's testimony that her father showered with her and helped her to wash her private area. Montelli testified that in her role as a forensic interviewer, she often asked a suspected victim about bathing procedures, because it is important for the interviewer to determine whether someone helps the child bathe. When asked whether sexual abuse could arise from bathing a child, Montelli responded that it could. Furthermore, although she testified that it is not uncommon for parents to bathe with their younger children, she also testified that the appropriateness of such behavior depends on the age of the child, and that the age of the victim at the time, five years old, raised the possibility that it may have been inappropriate for the father to bathe with her.

Finally, we note that the father initially refused to obtain testing for chlamydia, only obtaining testing when Hammie arranged for him to do so free of charge. Although Hammie testified that the reason for the father's initial refusal was because he could not afford

---

[10] We note that the mother testified that the victim first began to manifest symptoms in November, prior to the father's return home, and that the mother did not bring the victim to the hospital at first because she believed that the vaginal irritation was caused by the liquid soap that the mother had been using to bathe the victim. We also note, however, that no hospital records were introduced that might have corroborated this testimony. Whether to credit the mother's testimony regarding the earlier onset of the victim's symptoms would be within the province of the jury.

the test and did not have health insurance, the jury would have been free to disbelieve that financial considerations were the sole cause of the father's delay in taking the test. Had they done so, the father's delay in obtaining testing would support the defendant's third party culpability theory.[11]

On the basis of our analysis of the cumulative evidence presented at trial in support of the defendant's third party culpability defense, and viewing that evidence in the light most favorable to the defendant, we conclude that the defendant sustained his burden to offer sufficient evidence to show a direct connection between the father and the assault of the victim. The trial court, therefore, improperly refused to give the third party culpability instruction.

The question remains whether the error was harmless. It is unnecessary for us to determine whether we should apply the constitutional or nonconstitutional standard of harmless error review in resolving this issue, because the defendant meets the nonconstitutional standard of harmless error review applicable to rulings in a criminal trial. That is, because we do not have "a fair assurance that the error did not substantially affect the verdict"; (internal quotation marks omitted) *State* v. *Sawyer*, 279 Conn. 331, 357, 904 A.2d 101 (2006); we conclude that the error was not harmless. First, as we have already explained, the evidence would have justified a jury determination that a reasonable doubt existed as to the defendant's guilt. A jury instruc-

[11] We note that the defendant also relied on the fact that the victim cried when she was brought to Boys' Village, contending that her trauma provided evidence of a motive to lie to protect her father, so that she could avoid future placement, away from her mother and father, in such a facility. It is simply too speculative, however, to suppose that a five year old child would fabricate a story implicating the defendant for a sexual assault committed against her by her father in order to prevent her removal from the family home, particularly in light of the fact that she was brought to Boys' Village only after she had already implicated the defendant.

tion regarding the third party culpability evidence from the court may well have tipped the balance. Second, this was not a very strong case for the state. The primary evidence against the defendant was the testimony, as well as the out-of-court statements to third parties, of the victim, who was five years old at the time of the assaults, and eight years old at the time of trial. The medical evidence in this case was equivocal, because, although it was clear that a child of five years old who tested positive for chlamydia had been sexually assaulted by someone, both the father and the defendant were tested months after the victim had been diagnosed with chlamydia and both tested negative.[12]

## II

The defendant claims that his right to confrontation was violated by the admission of: (1) the videotaped testimony of the victim; (2) Montelli's testimony recounting the statements the victim made to her, which were admitted under the medical treatment exception to the hearsay rule; and (3) Gonzalez' testimony recounting the statements the victim made to her, which were admitted under the constancy of accusation exception to the hearsay rule. The defendant concedes that these claims are unpreserved, and he seeks to prevail pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[13] Because the record is adequate

[12] Murphy testified that the negative tests were not conclusive as to whether either the defendant or the father could have had chlamydia at the time that the victim was infected, because chlamydia has the potential to "clear itself" with time.

[13] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." *State* v. *Golding*, supra, 213 Conn. 239–40. The defendant also seeks to prevail on these claims under

for review and the claim is of constitutional magnitude, we address each of his claims in turn.

We turn first to the defendant's claim that the admission of the victim's videotaped testimony violated his right to confrontation guaranteed by the sixth amendment to the United States constitution.[14] The defendant contends that the victim's videotaped testimony, because it was taken prior to trial, constituted an out-of-court statement by a witness against the defendant, and therefore that its admissibility was governed by *Crawford* v. *Washington,* supra, 541 U.S. 36. The defendant further claims that the admission of the videotaped testimony at trial violated his sixth amendment right to confrontation because the state failed to bear its burden under *Crawford* of showing that the victim was unavailable to testify at trial, and, in fact, did not even attempt to make any such showing. Because we conclude that *Crawford* does not apply, we disagree with the defendant.

The following additional facts are relevant to the resolution of this issue. On March 18, 2004, the state filed a motion pursuant to General Statutes § 54-86g (a), seeking to have the victim's testimony taken outside the presence of the defendant via videotape, to be used in lieu of in-court testimony during the trial.[15] In support

___

the plain error doctrine. Because we conclude that the defendant cannot prevail under *Golding*, and because we see no basis on which the defendant may prevail under the plain error doctrine, we reject his plain error claim.

[14] The defendant also claims that the admission of the videotaped testimony violated his right to confrontation guaranteed by the state constitution, but does not provide a separate state constitutional analysis. We, therefore, decline to address it. See *Batte-Holmgren* v. *Commissioner of Public Health,* 281 Conn. 277, 294 n.9, 914 A.2d 996 (2007) (court will not entertain state constitutional claim unless separately briefed and analyzed).

[15] General Statutes § 54-86g (a) provides: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom in the presence and under the supervision of the trial judge hearing the matter and be televised by closed circuit equipment in the

of its motion, the state alleged that testifying in the presence of the defendant would "be detrimental to the victim," and that she "would be so intimidated or otherwise inhibited by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question." As required under § 54-86g (a), the state requested that the victim be permitted to testify before the trial judge, in the presence of only the prosecutor, defense counsel and any person whose presence would contribute to the welfare and well-being of the victim, and that the defendant be permitted to view the testimony in a witness room equipped with a one-way mirror and with the assistance of communication devices allowing him to communicate with his attorney during the proceeding. At the beginning of the hearing on the state's motion, the court stated that the purpose of the hearing was to determine "whether or not the child can testify reliably . . . in [the defendant's] presence." During the hearing, the state presented the testimony of a medical expert, Karen Brody, a psychiatrist and the assistant medical director at the Child Guidance Center of South-

courtroom or recorded for later showing before the court. Only the judge, the defendant, the attorneys for the defendant and for the state, persons necessary to operate the equipment and any person who would contribute to the welfare and well-being of the child may be present in the room with the child during his testimony, except that the court may order the defendant excluded from the room or screened from the sight and hearing of the child only if the state proves, by clear and convincing evidence, that the child would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that a compelling need exists to take the testimony of the child outside the physical presence of the defendant in order to insure the reliability of such testimony. If the defendant is excluded from the room or screened from the sight and hearing of the child, the court shall ensure that the defendant is able to observe and hear the testimony of the child, but that the child cannot see or hear the defendant. The defendant shall be able to consult privately with his attorney at all times during the taking of the testimony. The attorneys and the judge may question the child. If the court orders the testimony of a child to be taken under this subsection, the child shall not be required to testify in court at the proceeding for which the testimony was taken."

ern Connecticut, where she conducted forensic psychiatric evaluations of children. On the basis of Brody's evaluation of the victim, Brody testified that, in her opinion, the victim would be unable to testify reliably in the presence of the defendant in court, and even stated that she believed that the victim "would be virtually unable to say anything" about the assaults in the presence of the defendant. On the basis of Brody's testimony, the court granted the state's motion, finding that the state had met its burden to show, by clear and convincing evidence, that the victim would be so intimidated by the presence of the defendant, that the trustworthiness and reliability of her testimony seriously would be called into question. Subsequently, the victim's videotaped testimony was played for the jury during the defendant's trial.

In *Crawford* v. *Washington*, supra, 541 U.S. 36, the Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. Id., 68. In adopting this "categorical" approach, the court overturned existing precedent that had applied an "open-ended balancing [test]"; id., 67–68; conditioning the admissibility of out-of-court statements on a court's determination of whether the proffered statements bore "adequate indicia of reliability." (Internal quotation marks omitted.) *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980). Although *Crawford*'s revision of the court's confrontation clause jurisprudence is significant, its rules govern the admissibility only of certain classes of statements, namely, testimonial hearsay. In the wake of *Crawford*, therefore, the preliminary step in any confrontation clause analysis is the determination of whether the subject statements are testimonial hearsay. Because the

parties agree that the statements of the victim were testimonial in nature, our inquiry focuses on whether the statements constituted hearsay under *Crawford*.

In reconsidering the test that it previously had applied under *Ohio* v. *Roberts*, supra, 448 U.S. 56, the court was concerned that the *Roberts* test "[had] stray[ed] from the original meaning of the [c]onfrontation [c]lause . . . ." *Crawford* v. *Washington*, supra, 541 U.S. 42. In explaining the need to craft a rule more in keeping with the original intent of the clause, the court engaged in a detailed analysis of the background of the right to confrontation. Id., 43. On the basis of that historical background, the court concluded that "the principal evil at which the [c]onfrontation [c]lause was directed was the civil-law mode of criminal procedure, and particularly *its use of ex parte examinations as evidence against the accused.*" (Emphasis added.) Id., 50. Therefore, the court inferred, "not all hearsay implicates the [s]ixth [a]mendment's core concerns." Id., 51. In distinguishing the types of statements that do implicate the sixth amendment's "core concerns" from those that do not, the court looked to existing common law at the time of the ratification of the amendment in 1791. Id., 46. Particularly relevant to our analysis was the court's observation that, although "[s]ome early cases went so far as to hold that prior testimony was inadmissible in criminal cases *even if* the accused had a previous opportunity to cross-examine . . . [m]ost courts rejected that view, but only after reaffirming that admissibility depended on a prior opportunity for cross-examination." (Citations omitted; emphasis in original.) Id., 50. Taken together with the court's emphasis on the existing common law at the time of ratification, this observation suggests that, as long as there was a previous opportunity for cross-examination, prior testimony is not the type of statement that implicates the sixth amendment's core concerns.

This conclusion is supported by the court's summary of the "core class of testimonial statements": "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony *that the defendant was unable to cross-examine,* or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . . [S]ome statements qualify under any definition—for example, *ex parte testimony* at a preliminary hearing." (Citations omitted; emphasis altered; internal quotation marks omitted.) Id., 51–52. Once again, the court indicated that prior testimony implicates the right to confrontation only when the circumstances under which the prior testimony was taken deprived the defendant of the opportunity to cross-examine the witness.

The procedures prescribed by § 54-86g (a) are designed to balance carefully both the defendant's right to confrontation and the state's interest in securing reliable testimony from minor victims of sexual assault. See General Statutes § 54-86g (a). We approved of virtually identical procedures in *State* v. *Jarzbek,* 204 Conn. 683, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988).[16] In that case, we addressed the same issues that are before us in the present appeal, namely, whether the videotaped testimony of the minor victim violated the defendant's right to confrontation because the testimony was taken outside the presence of the defendant, and whether those statements constituted out-of-court statements. Id., 689, 697. In rejecting the view that the videotaped testimony constituted hearsay, we looked to the proce-

---

[16] In *Jarzbek,* we noted § 54-86g had not become effective until after the initiation of the action against the defendant. *State* v. *Jarzbek,* supra, 204 Conn. 686 n.2.

dures followed by the trial court, and now mandated by § 54-86g (a). We noted that the minor victim's testimony was "videotaped at a hearing before the trial judge, held in a modified courtroom, and conducted specifically for the purpose of preserving the [witness'] testimony for trial . . . [and that] both the state and the defendant had a full opportunity to examine and cross-examine the witness at the hearing." Id., 696. We concluded that these procedures not only made the videotaped testimony "inherently more reliable than the out-of-court declarations characterized as hearsay," but also that the procedures rendered the videotaped testimony the "functional equivalent of testimony in court." Id., 697.

The defendant does not contend in this appeal that the trial court did not implement the procedures mandated by § 54-86g (a) and *Jarzbek*, and the record reveals that, just as the statute and *Jarzbek* require, the trial court heard the testimony in a witness room with a one-way mirror, and that the defendant had the opportunity for cross-examination. Because we have concluded that under such conditions the videotaped testimony is the functional equivalent of in-court testimony, it was not testimonial hearsay and therefore does not fall within the ambit of *Crawford*. Our conclusion finds further support in the facts that the procedure was not ex parte and did not deprive the defendant of the opportunity for cross-examination. Therefore, the victim's testimony was not the type of prior testimony that implicates the core concerns of the confrontation clause.

That conclusion, however, does not end our analysis. The question remains whether the fact that the witness was allowed to testify without having to face the defendant violated the defendant's right to confrontation. The Supreme Court addressed this issue in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d

666 (1990).[17] In that case, the court recognized that the confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact"; (internal quotation marks omitted) id., 844; but the court also noted that it had never concluded that "the [c]onfrontation [c]lause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial." (Emphasis in original.) Id. In *Craig*, the child witness in a child abuse case was allowed to testify against the defendant by one-way closed circuit television. Id., 840. In concluding that the procedure did not run afoul of the confrontation clause, the court noted that its precedents established that "the [c]onfrontation [c]lause reflects a *preference* for face-to-face confrontation at trial . . . that must occasionally give way to considerations of public policy and the necessities of the case . . . ."[18] (Citations omit-

---

[17] The defendant contends that the court's decision in *United States* v. *Gonzalez-Lopez*, 548 U.S. 140, 145, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006), impliedly overruled *Craig*. We disagree. The court in *Gonzalez-Lopez* had before it a claim that the defendant's sixth amendment right to counsel of his choice had been violated. Id., 142. In the opinion, the court cites briefly to Justice Scalia's dissent in *Craig*. "[T]he [g]overnment's argument in effect reads the [s]ixth [a]mendment as a more detailed version of the [d]ue [p]rocess [c]lause—and then proceeds to give no effect to the details. It is true enough that the purpose of the rights set forth in that [a]mendment is to ensure a fair trial; but it does not follow that the rights can be disregarded so long as the trial is, on the whole, fair. What the [g]overnment urges upon us here is what was urged upon us (successfully, at one time, see *Ohio* v. *Roberts*, [supra, 448 U.S. 56]) with regard to the [s]ixth [a]mendment's right of confrontation—a line of reasoning that 'abstracts from the right to its purposes, and then eliminates the right.' *Maryland* v. *Craig*, [supra, 497 U.S. 862] (Scalia, J., dissenting)." *United States* v. *Gonzalez-Lopez*, supra, 145. Read in context, the language quoted from *Craig* merely alludes to the court's already stated rejection in *Crawford* of the premise underlying *Roberts*, that the right to confrontation can be safeguarded by ensuring that the policy underlying the right, ensuring reliable testimony, is guaranteed.

[18] We note that one of the precedents the court relied on was *Ohio* v. *Roberts*, supra, 448 U.S. 56. Although the court subsequently overruled *Roberts* in *Crawford* v. *Washington*, supra, 541 U.S. 36, that decision was aimed at out-of-court statements, with the goal, in that context, of disentangling confrontation clause jurisprudence from the hearsay doctrine. The court in *Craig* expressly declined to hold that the child witness' closed

ted; emphasis in original; internal quotation marks omitted.) Id., 849. The court stated further: "[W]e hold that, if the [s]tate makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." Id., 855. Finally, the court noted that the use of Maryland's procedure allowing child victims to testify via closed circuit "ensures the accuracy of the testimony and preserves the adversary nature of the trial. . . . Indeed, where face-to-face confrontation causes significant emotional distress in a child witness, there is evidence that such confrontation would in fact *disserve* the [c]onfrontation [c]lause's truth-seeking goal." (Citation omitted; emphasis in original.) Id., 857.

We have concluded that, under appropriate circumstances, the state's interest in securing reliable testimony from the particular child victim in question may outweigh a defendant's right of face-to-face confrontation. *State* v. *Jarzbek*, supra, 204 Conn. 704. In order to determine whether such appropriate circumstances exist, "a trial court must determine, at an evidentiary hearing, whether the state has demonstrated a compelling need for excluding the defendant from the witness room during the videotaping of a minor victim's testimony. In order to satisfy its burden of proving compelling need, the state must show that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthi-

circuit testimony constituted out-of-court statements. *Craig* v. *Maryland*, supra, 497 U.S. 851. Therefore, *Craig*'s reliance on *Roberts*, among other precedents, for its conclusion that the right to face-to-face confrontation properly may be balanced against competing public interests, does not invalidate its holding that such a balancing is proper.

ness of the victim's testimony would be seriously called into question." Id., 704–705. Our state rule places the greater emphasis on the state's compelling need to secure reliable testimony, whereas the scheme found constitutionally permissible in *Maryland* v. *Craig*, supra, 497 U.S. 836, focused on protecting child witnesses from trauma. Both the Maryland statutory scheme and our own under § 54-86g and *Jarzbek*, however, recognize that protecting child witnesses from the trauma of testifying in the face of the defendant and securing reliable testimony from such child witnesses are inextricably linked. Indeed, although our own system requires that "the primary focus of the trial court's inquiry must be on the reliability of the minor victim's testimony," we stated in *Jarzbek* that "the trial court may consider the well-being of the witness as a significant factor in its analysis . . . ." *State* v. *Jarzbek*, supra, 705.

The trial court in the present case made the required particularized finding. Specifically, the court found, based on the testimony of Brody, that the state had met its burden of showing, by clear and convincing evidence, that the victim would be so intimidated by the presence of the defendant, that the trustworthiness and reliability of her testimony seriously would be called into question. Under such circumstances, the state's compelling interest in securing reliable testimony from the child victim outweighed the defendant's right of face-to-face confrontation. Moreover, the trial court employed all the safeguards mandated by the statute, all of which are aimed at protecting the defendant's right of confrontation and preserving the "adversary nature of the trial." *Maryland* v. *Craig*, supra, 497 U.S. 857. His defense counsel had ample opportunity for cross-examination of the witness; he was offered the opportunity to view the testimony from behind a one-way mirror, with the opportunity for full and free

communication with his attorney during questioning of the witness; the proceeding took place in a modified courtroom setting with the trial judge present; and the jury was able, by viewing the videotape, to observe the testimony and demeanor of the witness in order to evaluate her credibility. Under these circumstances, we conclude that the trial court struck the proper balance between protecting the defendant's right of confrontation and the state's interest in securing reliable testimony from the child victim. Therefore, the defendant's claim fails on the third prong of *Golding*, because he has failed to show that the alleged constitutional violation exists. *State* v. *Golding*, supra, 213 Conn. 241.

We next address the defendant's claim that the trial court improperly allowed Montelli to recount, during her testimony, the statements that the victim had made to her during the forensic interviews that Montelli conducted with the victim. Although the trial court admitted the child's hearsay statements under the medical treatment exception to the hearsay rule, the defendant claims that the court properly should have excluded the statements as testimonial hearsay under *Crawford* v. *Washington*, supra, 541 U.S. 36, because law enforcement personnel observed Montelli's interviews with the victim and were allowed to make and retain audiotapes of those interviews.

The following additional facts are relevant to our resolution of this claim. Montelli, the licensed clinical social worker whose interviews with the victim are the subject of the defendant's claim, was an employee of Yale-New Haven Hospital, in the Child Sexual Abuse Clinic, at the time of the subject interviews. The clinic's function is to provide medical and mental health evaluations of the children who have made allegations of sexual abuse and formulate treatment plans for the children on the basis of those evaluations. Each forensic interviewer works in conjunction with a medical profes-

sional on a given case, and the medical professional relies upon the forensic interviewer's work in performing the medical examination of the child, diagnosing the child, and formulating a treatment plan for the child. In fact, Montelli testified that the information she obtains during the mental health evaluation of the child is "crucial" to the medical provider in his or her examination of the child. The medical professional and the forensic interviewer engage in ongoing communication and consultation as the case unfolds.

Montelli's interviews with the victim took place in the clinic's interview room, which is equipped with a one-way mirror. When such an interview is conducted, several persons observe the interview from behind the mirror, including a police officer, a department representative, and, schedule permitting, Montelli's partner in the case. Hammie observed the interviews behind a one-way mirror, and during at least the first and third interviews, a member of law enforcement also observed the interview behind the one-way mirror. The first and third interviews that Montelli conducted with the victim were tape-recorded with a recording device supplied by the police. Following each interview, Montelli gave the cassette to the police. During the third and final interview with Montelli, on May 23, 2002, the victim disclosed to her that the defendant had sexually assaulted her on three separate occasions.

As we stated previously in this opinion, post-*Crawford* confrontation clause analysis must begin with the question of whether the subject statements are testimonial hearsay. It is undisputed that Montelli's testimony regarding the victim's statements involves hearsay. Therefore, our preliminary inquiry focuses solely on whether the victim's statements to Montelli were testimonial in nature, and subject to *Crawford*'s strictures, or nontestimonial, and thus subject to the rules of evidence. The United States Supreme Court has provided

guidance on this issue in *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

In *Davis*, the court undertook to clarify one of the issues that it had left unresolved in *Crawford*, namely, the meaning of the term "testimonial." *Davis* involved the admissibility, in two consolidated cases, of hearsay statements that the defendants in each case had claimed were testimonial under *Crawford*.[19] Id., 817. In *Davis*, the statements at issue were the victim's statements made to a 911 dispatcher while the victim was being assaulted. Id. During the telephone call, the victim had identified the defendant as her attacker. Id., 818. In *Hammon* v. *Indiana*, 829 N.E.2d 444 (Ind.), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005), rev'd sub nom. *Davis* v. *Washington*, supra, 547 U.S. 813, the companion case reported with *Davis*, the court considered the victim's statements made to the police officer who responded to a reported domestic disturbance. *Davis* v. *Washington*, supra, 819. When the officer arrived, both the victim and the defendant were still in the home, but any violence between the two had already ceased. Id., 830. The officer persuaded the victim to fill out a battery affidavit, in which she stated that the defendant had attacked her and her daughter. Id., 820.

In deciding whether the statements in the two cases were testimonial or not, the court articulated the following rule: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an

[19] The Supreme Court's consolidated opinion in *Davis* resolved two cases on which it had granted certiorari: *Hammon* v. *Indiana*, 829 N.E.2d 444 (Ind.) (addressing on scene statements to police officers), cert. granted, 546 U.S. 976, 126 S. Ct. 552, 163 L. Ed. 2d 459 (2005), rev'd sub nom. *Davis* v. *Washington*, supra, 547 U.S. 813; and *State* v. *Davis*, 154 Wash. 2d 291, 111 P.3d 844 (involving statements to 911 operators), cert. granted, 546 U.S. 975, 126 S. Ct. 547, 163 L. Ed. 2d 458 (2005), aff'd, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Emphasis added.) Id., 822. Applying this test, the court concluded that the victim's statements in *Davis* were nontestimonial because they were made while the attack was ongoing. During the call, her "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." Id., 827. Under such circumstances, the primary purpose of the victim's statements were to "enable police assistance to meet an ongoing emergency. [The victim] simply was not acting as a *witness*; she was not *testifying*. . . . No witness goes into court to proclaim an emergency and seek help." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 828. By contrast, the court considered the statements at issue in *Hammon* to be similar to those the court had deemed testimonial hearsay in *Crawford*. Id., 829. Because the officer's interrogation of the victim in *Hammon* was an inquiry into "possibly criminal past conduct" and, therefore, his primary purpose in questioning her was to investigate, not to provide emergency assistance, the victim's statements were testimonial in nature. Id., 829–30.

We first note that the court, in applying the test it articulated in *Davis*, essentially performed a fact intensive test, based on the totality of the circumstances, to each of the cases before it. We also note that, in both *Davis* and *Hammon*, the court began with the premise that the statements at issue were made to law enforcement officers or to agents of law enforcement. Id., 823 n.2. In fact, because the court assumed without deciding that the actions of 911 operators can be acts of the police, it was "unnecessary to consider whether and when statements made to someone other than law

enforcement personnel are 'testimonial.' " Id. Thus, the test articulated in *Davis* provides clear guidance for delineating testimonial and nontestimonial statements when those statements are made to a member of law enforcement or to an agent of the police. Under those circumstances, the classification of the statements depends on whether the member or agent of law enforcement is acting in order to address an "ongoing emergency" or to "establish or prove past events potentially relevant to later criminal prosecution." Id., 822. It is apparent from this formulation of the test that the timing of the statements in relation to the subject events is crucial to the determination of the testimonial nature of the statements.

The court in *Davis* declined to resolve, however, "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " Id., 823 n.2. Nonetheless, the court's analysis makes clear that the determining factor resolving whether the subject statements are testimonial or nontestimonial is the primary purpose of the interrogation between the declarant and the witness whose testimony the state later seeks to introduce regarding the declarant's statements; that is, whether the interrogation is primarily intended to provide assistance to the declarant or to further investigation and preparation for prosecution. It is only the second purpose that implicates the confrontation clause. Put another way, statements taken by government actors who are not members of law enforcement are testimonial if the interview is the functional equivalent of police interrogation with the primary purpose of establishing or proving past events potentially relevant to later criminal prosecution. This is consistent with *Crawford*'s identification of the "core class of testimonial statements" as including "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations,

prior testimony that the defendant was unable to cross-examine, or similar pretrial *statements that declarants would reasonably expect to be used prosecutorially*" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Crawford v. Washington,* supra, 541 U.S. 51–52. Declarants who make statements, even regarding a possible crime, in order to obtain assistance, do not do so with the intent or expectation of assisting the state in building a case against a defendant, nor do the recipients of such statements act with such intent or expectation. As the court stated in *Davis,* when making statements in order to obtain emergency assistance, "[the victim] simply was not acting as a *witness*; she was not *testifying.* . . . No witness goes into court to proclaim an emergency and seek help." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Davis v. Washington,* supra, 547 U.S. 828. Thus, in focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution.[20]

---

[20] We recognize that other jurisdictions have concluded that statements made to a forensic interviewer are testimonial. The majority of these opinions, however, are factually distinguishable from the present case because most involve much more significant involvement in and control of the subject interviews by law enforcement. See, e.g., *United States v. Gardinier,* 65 M.J. 60, 66 (2007) (victim's statements to sexual assault nurse examiner during forensic medical examination testimonial where sheriff's office arranged for examination and paid for examination and was performed with needs of law enforcement and prosecution in mind); *People v. Sharp,* 155 P.3d 577, 581 (Colo. 2006) (victim's statements during videotaped interview with forensic interviewer testimonial where police arranged, and to some extent, directed interview by directing interviewer to ask specific questions and interviewer sought victim's permission to bring police detective into

Applying these principles to the present case, we focus our inquiry on the primary purpose of Montelli's

interview room); *State* v. *Henderson*, 284 Kan. 267, 284–85, 160 P.3d 776 (2007) (interview conducted jointly by social worker and detective testimonial; detective continually involved in interview process, initiated interview and involved in decision not to interview or attempt to locate anyone besides defendant); *State* v. *Justus*, 205 S.W.3d 872, 876 (Mo. 2006) (statements made to forensic interviewer testimonial where interviewer testified that interviews she conducted were for law enforcement and served investigatory, fact-finding purpose); *State* v. *Pitt*, 209 Or. App. 270, 277–79, 147 P.3d 940 (2006) (videotaped interviews with forensic interviewer at child advocacy center, testimonial where interviewer is former police officer, center operates in partnership with district attorney's office, interviews were conducted with express purpose of furthering police investigation, and interviews were structured to elicit information from child that would be relevant to prosecution); *In Interest of S.R.*, 920 A.2d 1262, 1263–64 (Pa. Super. 2007) (statements during interview with forensic interview specialist were testimonial where specialist was contacted initially by police, interview was carried out under direction of police, who were consulted during interview, which was conducted expressly for purposes of investigation and potential prosecution).

Decisions from other jurisdictions, also concluding that statements made to a forensic interviewer are testimonial under *Davis*, although more factually similar to the present case, are unpersuasive. An illustrative decision is that in *State* v. *Blue*, 717 N.W.2d 558 (N.D. 2006), a case often cited for the proposition that statements made to a forensic interviewer are testimonial. That case involved the victim's statements to a forensic interviewer, while a police officer observed on closed circuit television from another room. Id., 561. After the interview concluded, the interviewer gave the videotaped recording to the officer. Id. The court considered four facts essential in determining that the victim's statements were testimonial: (1) the interviewer's job title included the term "[f]orensic," which "by definition means 'suitable to courts.' Merriam-Webster's Collegiate Dictionary 490 (11th Ed. 2005)."; (2) a police officer observed the interview; (3) the forensic interviewer delivered the videotape of the interview to the police officer at the conclusion of the interview; and (4) there was no ongoing emergency at the time of the interview. *State* v. *Blue*, supra, 564. On the basis of those facts, the court concluded that the purpose of the interview was to "establish or prove past events potentially relevant [to later] criminal prosecution . . . ." (Internal quotation marks omitted.) Id., 565, quoting *Davis* v. *Washington*, supra, 547 U.S. 822. According to the court, the only circumstance under which such an interview could be considered nontestimonial would be if it were "done strictly for medical purposes, and not in anticipation of criminal proceedings . . . ." *State* v. *Blue*, supra, 563.

We find *Blue* unpersuasive for two reasons. First, the requirement that interview statements must serve *only* medical purposes in order to be considered nontestimonial ignores the reasoning employed in *Davis*, which bases the determination of the testimonial or nontestimonial character of interview

interviews with the victim in determining whether the victim's statements were testimonial in nature. Under the facts of the present case, it is clear that the primary purpose of those interviews was to provide medical assistance to the victim. The clinic's system, in each case of alleged sexual abuse, of pairing a forensic interviewer who specializes in mental health assessment and treatment with a medical care provider, suggests that the clinic views the treatment of the victim's mental and physical harms suffered due to the abuse as closely linked. This conclusion is bolstered by the fact that the medical care provider relies upon the forensic interviewer's work in examining the child, by the repeated

statements on the "primary purpose" of the interview. *Davis* v. *Washington,* supra, 547 U.S. 822. Requiring that an interview serve an exclusively medical purpose in order to be considered nontestimonial, therefore, is simply not based on an accurate reading of *Davis.* The mere fact that police are involved, as in the present case, because they are made privy to the information obtained in the interview, is not sufficient, without more, to render the interviews testimonial. The question, under *Davis,* is instead whether the primary purpose of the interview is to "establish or prove past events potentially relevant [to later] criminal prosecution . . . ." (Internal quotation marks omitted.) *State* v. *Blue,* supra, 717 N.W.2d 565, quoting *Davis* v. *Washington,* supra, 822. Second, we disagree that a forensic interviewer must be responding to an ongoing emergency in order for statements made to such an actor to be deemed nontestimonial. Such a requirement ignores the distinction between a forensic interviewer and a police officer. The court in *Davis* sought to determine under what circumstances statements made to a police officer would be considered testimonial, and suggested that the key task is to determine the function of the interview or interrogation, namely, whether the officer sought, in asking questions, to obtain information for the primary purpose of providing assistance to the victim or for the primary purpose of building a case against the defendant. When police officers provide assistance to victims, it is generally when there is an ongoing emergency, so it makes sense in that context to require that the statements be contemporaneous with the subject events. A social worker or forensic interviewer, however, by the very nature of the assistance provided to a victim, *always* does so after the immediate emergency has passed. A victim of sexual assault does not seek counseling or mental health assessment during the assault. Therefore, the interview, and the statements derived therefrom, will always involve past events. The question is whether the statements were elicited with the primary purpose of establishing those past events to build a case against the defendant, or with the purpose of assisting the victim.

communications and consultations between the medical care provider and the forensic interviewer, and by the participation of the forensic interviewer in the ultimate diagnosis and formulation of a treatment plan for the child. The structure of the clinic's treatment of alleged victims of sexual abuse leads us to conclude that Montelli, as a forensic interviewer, was an integral part of the chain of medical care.

As we noted in *State* v. *Cruz*, 260 Conn. 1, 12, 792 A.2d 823 (2002), a social worker is a mandated reporter pursuant to General Statutes § 17a-101.[21] Thus, Montelli was required by law to report the suspected child abuse.

---

[21] General Statutes § 17a-101 provides in relevant part: "(a) The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse, investigation of such reports by a social agency, and provision of services, where needed, to such child and family.

"(b) The following persons shall be mandated reporters: Any physician or surgeon licensed under the provisions of chapter 370, any resident physician or intern in any hospital in this state, whether or not so licensed, any registered nurse, licensed practical nurse, medical examiner, dentist, dental hygienist, psychologist, coach of intramural or interscholastic athletics, school teacher, school principal, school guidance counselor, school paraprofessional, school coach, *social worker*, police officer, juvenile or adult probation officer, juvenile or adult parole officer, member of the clergy, pharmacist, physical therapist, optometrist, chiropractor, podiatrist, mental health professional or physician assistant, any person who is a licensed or certified emergency medical services provider, any person who is a licensed or certified alcohol and drug counselor, any person who is a licensed marital and family therapist, any person who is a sexual assault counselor or a battered women's counselor as defined in section 52-146k, any person who is a licensed professional counselor, any person paid to care for a child in any public or private facility, child day care center, group day care home or family day care home licensed by the state, any employee of the Department of Children and Families, any employee of the Department of Public Health who is responsible for the licensing of child day care centers, group day care homes, family day care homes or youth camps, the Child Advocate and any employee of the Office of Child Advocate. . . ." (Emphasis added.)

Moreover, the practice of allowing law enforcement personnel to observe the interviews was consistent with the goals underlying General Statutes § 17a-106a, which allows for the creation of multidisciplinary teams for the purpose of reviewing cases of child abuse.[22] The stated purposes of the multidisciplinary teams includes the advancement and coordination of the prompt investigation of suspected cases of child abuse, but also includes the goals of reducing the trauma to the child victim and ensuring the protection and treatment of the child victim. General Statutes § 17a-106a (a). Montelli in fact testified that she was a member of a "multidisciplinary investigative team" that included social workers, medical providers and a child life specialist. Working together with other agencies with what she referred to as a larger, "umbrella" group, the team has as its goal the promotion of child welfare. By allowing law enforcement personnel, as well as a representative

[22] General Statutes § 17a-106a provides in relevant part: "(a) The Commissioner of Children and Families, may as department head of the lead agency, and the appropriate state's attorney establish multidisciplinary teams for the purpose of reviewing particular cases or particular types of cases or to coordinate the prevention, intervention and treatment in each judicial district to review selected cases of child abuse or neglect. The purpose of such multidisciplinary teams is to advance and coordinate the prompt investigation of suspected cases of child abuse or neglect, to reduce the trauma of any child victim and to ensure the protection and treatment of the child. The head of the local law enforcement agency or his designee may request the assistance of the Division of State Police within the Department of Public Safety for such purposes.

"(b) Each multidisciplinary team shall consist of at least one representative of each of the following: (1) The state's attorney of the judicial district of the team, or his designee; (2) the Commissioner of Children and Families, or his designee; (3) the head of the local or state law enforcement agencies, or his designee; (4) a health care professional with substantial experience in the diagnosis and treatment of abused or neglected children, who shall be designated by the team members; (5) a member, where appropriate, of a youth service bureau; (6) a mental health professional with substantial experience in the treatment of abused or neglected children, who shall be designated by the team members; and (7) any other appropriate individual with expertise in the welfare of children that the members of the team deem necessary. Each team shall select a chairperson. . . ."

from the department, to observe some of the interviews, Montelli reduced the chances that representatives from those agencies would need to interview the child separately, thus avoiding the need to subject the victim to the trauma of repeated interviews. There is no evidence in the record to indicate that the victim's interviews with Montelli were at the instruction or request of law enforcement. Instead, the record reflects that Hammie, an investigator with the department, initially brought the victim and the victim's mother to the clinic for examinations. Moreover, there is no indication that Montelli was in the employ of a law enforcement agency and no evidence that she cooperated or assisted in the investigation of the defendant. The purpose of her interviews was related solely to securing the welfare of the child. As she explained during her testimony: "[T]he purpose of my interview was to obtain information that would help us in determining what happened and what steps need to take place at that point." When questioned regarding what those "steps" would include, she clarified: "Medical treatment to secure her safety. Mental health treatment, if necessary." On the basis of these facts, we conclude that the primary purpose of the interviews was not to build a case against the defendant, but to provide the victim with assistance in the form of medical and mental health treatment. Therefore, the statements were nontestimonial, and the admission of those statements did not violate the defendant's right to confrontation.[23]

---

[23] We also conclude, on the basis of the circumstances of the victim's interviews with Montelli, that the trial court did not abuse its discretion in admitting the statements under the medical treatment exception to the hearsay rule. The facts of the present case closely mirror those in *State* v. *Cruz*, supra, 260 Conn. 10, in which we concluded that the rationale of the medical treatment exception applied to a social worker who was within the chain of medical care. Therefore, we concluded, statements made to such a social worker, in furtherance of obtaining medical treatment and "pertinent to the diagnosis or treatment sought," were admissible as an exception to the hearsay doctrine. Id., 6. In the present case, the victim, at the behest of her mother and Hammie, made the subject statements to Montelli in

The defendant's third and final confrontation challenge is directed at the testimony of Gonzalez, the victim's kindergarten teacher, regarding the statements the child made to her regarding the defendant. The circumstances of this interview, however, did not even remotely resemble an interview that would be considered to elicit testimonial statements under *Davis* and *Crawford*. The child met with the teacher at her mother's request because the mother trusted the teacher and was concerned when she discovered that the child had tested positive yet again for chlamydia, and there is no suggestion in the record that the teacher performed any investigatory function whatsoever. The admission of the statements did not implicate the defendant's right to confrontation.

### III

The defendant next claims that the trial court abused its discretion in admitting the testimony of Gonzalez, as constancy of accusation testimony, regarding the statements the victim had made to her on May 23, 2002. Specifically, the defendant contends that this testimony was barred by our decision in *State* v. *Samuels*, 273 Conn. 541, 871 A.2d 1005 (2005). We disagree.

The following additional facts are relevant to our resolution of this issue. On March 6, 2002, Hammie filed a report with the New Haven police department, informing the police department that the victim had tested positive for chlamydia. On May 27, 2005, the defendant filed a motion in limine seeking to preclude the state from introducing any constancy of accusation testimony by witnesses who spoke to the victim after

furtherance of obtaining medical treatment. Montelli's significant interaction and cooperation with the medical care provider in the victim's case establishes that Montelli was acting as an individual within the chain of medical care. Therefore, the trial court acted within its discretion in admitting Montelli's testimony under the exception.

March 6, 2002. After hearing argument from the parties, the trial court denied the defendant's motion, and the testimony of Gonzalez, reporting the statements the victim made to her regarding the defendant, were admitted under the constancy of accusation doctrine.

We first set forth the applicable standard of review. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) Id., 547.

We recently reviewed the historical and ideological underpinnings of the constancy of accusation doctrine, which "traces its roots to the fresh complaint rule . . . [t]he narrow purpose of [which] was to negate any inference that because the victim had failed to tell anyone that she had been [sexually assaulted], her later assertion of [sexual assault] could not be believed. . . . Because juries were allowed—sometimes even instructed—to draw negative inferences from the woman's failure to complain after an assault . . . the doctrine of fresh complaint evolved as a means of counterbalancing these negative inferences. Used in this way, the fresh complaint doctrine allowed the prosecutor to introduce, during the case-in-chief, evidence that the victim had complained soon after the [sexual assault]. Its use thereby forestalled the inference that the victim's silence was inconsistent with her present formal complaint of [assault]. . . . In other words, evidence admitted under this doctrine effectively served as anticipatory rebuttal, in that the doctrine often permitted the prosecutor to bolster the credibility of the victim before her credibility had first been attacked. . . . The fresh complaint doctrine thus constituted a rare exception to the common-law rule that prohibited

rehabilitative evidence in the absence of an attack on the witness's credibility. . . .

"In *State* v. *Troupe*, [237 Conn. 284, 303, 677 A.2d 917 (1996)], we observed that the state and the victim both have a legitimate interest in protect[ing] against the unwarranted, but nonetheless persistent, view that a sexual assault victim who does not report the crime cannot be trusted to testify truthfully about the incident. On the other hand, we observed that a defendant has an interest in not being unreasonably burdened by such accrediting or supporting evidence, which . . . generally is not admissible in the trial of crimes other than sexual assault. Id., 302. In light of these competing interests, we rejected the then existing rule that a person to whom a sexual assault victim had complained could provide substantive testimony with respect to the incident. See id., 303–304. Instead, we concluded that a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator. In all other respects, our current rules remain in effect. Thus, such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes. Before the evidence may be admitted, therefore, the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the incident was reported. In determining whether to permit such testimony, the trial court must balance the probative value of the evidence against any prejudice to the defendant. . . .

"In light of the history and purpose of the constancy of accusation doctrine we further concluded, in *State*

v. *Samuels*, supra, 273 Conn. 551–52, that statements made by a victim after he or she had filed an official complaint with the police were inadmissible as constancy of accusation evidence. In arriving at this conclusion, we reasoned that [o]nce a sexual assault victim has reported the crime to the police . . . corroborative testimony by constancy witnesses that is based on post-complaint conversations with the victim, even if relevant, no longer serves the purpose of countering a negative inference as to the victim's credibility because it is the inconsistency between the victim's silence following the assault and her subsequent complaint to the police that gives rise to such an inference." (Citations omitted; internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 539–41, 915 A.2d 822 (2007). Although the state had argued in *Samuels* that "no additional restrictions should be imposed on the use of constancy of accusation testimony when the sexual assault victim is a child," we expressly declined to consider the claim. *State* v. *Samuels*, supra, 555.

The history of the constancy of accusation doctrine, and the reasons for which we imposed the bright line rule in *Samuels*, persuade us that *Samuels* is not triggered when the declarant is a young child, as in the present case, and a state agency, rather than the child's parent or guardian, makes an official complaint to the police on behalf of the victim. Because young children will rarely, if ever, make an official complaint to the police, and because a state agency cannot be considered as an agent or a surrogate for the child in making such a complaint but, rather, must be viewed as acting in fulfilling its own institutional and statutory obligations; see General Statutes § 17a-101 (b); see footnote 21 of this opinion; the reasoning of *Samuels* simply does not apply. *Samuels* is a limitation on the constancy of accusation doctrine, based on the notion that, once a victim has herself reported the crime to the police, there would

no longer be any basis for an inference that her postassault silence was inconsistent with her in-court testimony. The need for that limitation is simply not present when the victim is a young child and a state agency has filed a police report based on information disclosed to it, and the testimony of the state agency or agent is simply not relevant to the credibility of the victim. Therefore, the March 6, 2002 report to the New Haven police department by Hammie did not trigger *Samuels*. Accordingly, the complaints that the victim made to Gonzalez on May 23, 2002, were not barred by *Samuels*, and the trial court did not abuse its discretion in permitting the constancy testimony.[24]

## IV

We next address the defendant's claim that the trial court failed to inquire adequately into his complaints that he could not communicate effectively with his non-Spanish speaking attorney, in violation of the defendant's right to counsel under the federal and state constitutions. We disagree that the trial court's inquiry was inadequate.

The additional facts are relevant to our resolution of this claim. During the year preceding the trial of the present case, the defendant repeatedly made complaints to the court about his trial counsel, filing two motions to dismiss counsel with the trial court and one motion to dismiss counsel with the statewide grievance committee. During the hearing conducted on the defendant's first motion to dismiss counsel, the defendant

---

[24] The defendant claims that our conclusion that *Samuels* is not triggered when an agency files an official complaint on behalf of a victim, "ignores the reality that young children will rarely call the police or [the department] themselves." We acknowledge that our ruling today may yield the result that in many cases involving sexual abuse of children, the bright line rule of *Samuels* will not apply. The admission of constancy of accusation testimony, however, will still be subject to the discretion of the trial court and to the restrictions placed thereon by *State* v. *Troupe*, supra, 237 Conn. 284.

informed the court that he was dissatisfied with the communication between himself and counsel, and he requested a Spanish speaking attorney. At that time, the majority of communication between the defendant and his attorney had been in writing. The defendant's attorney informed the court that both his secretary and his paralegal spoke Spanish and had been translating his correspondence with the defendant into Spanish. The court assured the defendant that he would be provided with an interpreter, and denied the defendant's motion without prejudice. The court held another hearing to address the defendant's concerns with his counsel on December 13, 2004. During that hearing, the defendant and counsel both represented to the court that the defendant did not agree with his attorney's strategic decisions in investigating the case and preparing for trial. The defendant also told the court that he believed the case was taking too long, that he did not "like" his attorney, and that his attorney did not understand him. The court stated that the defendant had given it no legal basis for dismissing counsel, and denied his motion to dismiss counsel.

During a hearing on February 15, 2005, defense counsel informed the court that the defendant had filed a motion to dismiss counsel with the statewide grievance committee. The court treated the motion as though the defendant had filed it with the trial court. On the merits of the motion, the defendant claimed that his attorney had a conflict of interest, including, among a litany of complaints, allegations that his counsel had provided him with false information, failed to discuss his case with him, and did not return calls or reply to written correspondence. Defense counsel denied the allegations and informed the court that he had held discussions through an interpreter with the defendant, and that the defendant had told him that he understood. He also reiterated that all correspondence to the defendant

from his office was in Spanish. The defendant then alleged that his attorney had accused him of having been caught with drugs in Stamford. When the attorney expressed confusion and an utter lack of knowledge regarding a "drug case" in Stamford, the defendant stated simply that he did not trust his counsel. Upon the defendant's request to represent himself, the court denied his motion to dismiss counsel, but also ordered a competency exam and scheduled a competency hearing pursuant to General Statutes § 54-56d.[25] At the subsequent hearing, the expert who had examined the defendant testified that the defendant was competent to stand trial. After the expert had so testified, the court informed the defendant that it had found him competent and asked the defendant if he still wished to dismiss counsel. The defendant conceded that he did not "get along with" counsel, and repeated his request for another attorney. The court explained to the defendant that he was not entitled to his choice of court-appointed attorneys and, after confirming that defense counsel believed that the attorney-client relationship had not

[25] General Statutes § 54-56d provides in relevant part: "(a) . . . A defendant shall not be tried, convicted or sentenced while the defendant is not competent. For the purposes of this section, a defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense. . . .

"(c) . . . If, at any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency. . . .

"(e) . . . The court shall hold a hearing as to the competency of the defendant no later than ten days after the court receives the written report. Any evidence regarding the defendant's competency, including the written report, may be introduced at the hearing by either the defendant or the state. If the written report is introduced, at least one of the examiners shall be present to testify as to the determinations in the report, unless the examiner's presence is waived by the defendant and the state. Any member of the clinical team shall be considered competent to testify as to the team's determinations. A defendant and the defendant's counsel may waive the court hearing only if the examiners, in the written report, determine without qualification that the defendant is competent. . . ."

broken down to the extent that counsel would no longer be able effectively to represent the defendant, and after receiving a negative answer when the court asked the defendant if there was any other reason, beyond his dislike of counsel, for his desire to have new counsel appointed for him, the court denied the defendant's motion.

Preliminarily, we note that, although the defendant contends that article first, § 8, of the Connecticut constitution provides greater protection than that afforded under the federal constitution, we consistently have arrived at the opposite conclusion. See, e.g., *State* v. *Drakeford*, 261 Conn. 420, 431, 802 A.2d 844 (2002) ("state and federal constitutional standards for review of ineffective assistance of counsel claims are identical" [internal quotation marks omitted]); *State* v. *Fernandez*, 254 Conn. 637, 652, 758 A.2d 842 (2000) (treating provisions of article first, § 8, and sixth amendment as "essentially coextensive"), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001); *Aillon* v. *Meachum*, 211 Conn. 352, 355 n.3, 559 A.2d 206 (1989) (citing to long line of cases approving of federal standard "without ever once indicating that the protection afforded by our state constitution imposes a different standard for review of such claims"). Accordingly, we conclude that the same standard applies under both the federal and state constitutions.

We addressed a similar claim in *State* v. *Vega*, 259 Conn. 374, 788 A.2d 1221 (2002). In *Vega*, we rejected the defendant's claim that he was denied effective assistance of counsel as a result of the trial court's refusal to permit his counsel to withdraw after the defendant had informed the court that he had filed a grievance against his attorney. Id., 380. In addressing the defendant's claim we emphasized that "our review is of the actions of the trial court, not of the actions of defense counsel." Id., 385. We explained that the focus of our

inquiry on the trial court's actions is due to the fact that, "[a]lmost without exception, we have required that a claim of ineffective assistance of counsel must be raised by way of habeas corpus, rather than by direct appeal, because of the need for a full evidentiary record for such [a] claim. . . . On the rare occasions that we have addressed an ineffective assistance of counsel claim on direct appeal, we have limited our review to allegations that the defendant's sixth amendment rights had been jeopardized by the actions of the *trial court*, rather than by those of his counsel. . . . We have addressed such claims, moreover, only where the record of the trial court's allegedly improper action was adequate for review or the issue presented was a question of law, not one of fact requiring further evidentiary development." (Emphasis in original; internal quotation marks omitted.) Id.

"[A] trial court has a responsibility to inquire into and to evaluate carefully all substantial complaints concerning court-appointed counsel . . . ." *State* v. *Robinson*, 227 Conn. 711, 726, 631 A.2d 288 (1993). "The extent of that inquiry, however, lies within the discretion of the trial court. . . . A trial court does not abuse its discretion by failing to make further inquiry where the [respondent] has already had an adequate opportunity to inform the trial court of his complaints." (Internal quotation marks omitted.) *In re Jeremy M.*, 100 Conn. App. 436, 456, 918 A.2d 944, cert. denied, 282 Conn. 927, 926 A.2d 666 (2007).

In the present case, the trial court gave the defendant ample opportunity to make his complaints known. Although the defendant several times requested a Spanish speaking attorney, he never claimed that the interpreter services that were provided to him were inadequate. On the contrary, the court had before it the repeated representations of counsel that translation services, provided both by the attorney's own staff and

outside interpreters, were being utilized. Our review of the record reveals that the true source of the defendant's dissatisfaction with his attorney was not due to any language barrier between the defendant and his attorney, but because of a personality conflict. Although the constitution guarantees a defendant counsel that is effective, it does not guarantee counsel whom a defendant will like. Therefore, the trial court did not abuse its discretion in denying the defendant's motions.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion the other justices concurred.